COMMISSIONER OF INTERNAL REV-
ENUE, Appellant,

v.

SCHUYLER GRAIN CO., Inc., Appellee.

No. 17260.

United States Court of Appeals
Seventh Circuit.

June 2, 1969.

Mitchell Rogovin, Asst. Atty. Gen., Tax Division, Robert I. Waxman, Lee A. Jackson, Jonathan S. Cohen, Attys., Dept. of Justice, Washington, D. C., for appellant.

Robert E. Johnson, William H. Krieg, Jerry Williams, Indianapolis, Ind., for appellee, Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., of counsel.

Before HASTINGS, Senior Circuit Judge, SWYGERT and FAIRCHILD, Circuit Judges.

HASTINGS, Senior Circuit Judge.

The Commissioner of Internal Revenue determined a deficiency in the income tax of Schuyler Grain Co., Inc. (taxpayer) for its fiscal year ending August 31, 1964, in the amount of $2,319.10.

Taxpayer brought this action on October 20, 1965 in the Tax Court of the United States challenging the Commissioner's denial of the investment tax credit claimed on five concrete grain storage bins constructed in 1964.

On May 8, 1969, the Tax Court, Honorable Graydon G. Withey, Judge presiding, entered its decision favorable to taxpayer and held that no tax deficiency was due for the year in question.[1] The Commissioner has appealed.

The issue presented for decision is whether the Tax Court erroneously concluded that taxpayer's five storage bins were *used in connection with* manufacturing, production or the furnishing of transportation services within the meaning of Section 48(a) (1) (B) (ii) of the Internal Revenue Code of 1954.[2]

Under Sections 38 and 46 of the 1954 Code, a taxpayer is entitled to a seven percent tax credit against his income tax for qualified investments in property. The type of property which qualifies for this investment is called "section 38 property" and is defined in Section 48, *supra*. Only property subject to depreciation and having a useful life of four years or more is included.

As applied to the instant case, qualified investment includes a storage facility of five grain bins which are either "an integral part of manufacturing, production, or extraction or of furnishing transportation" or a "storage facility used in connection with any of the activities" just referred to.

The Tax Court entered findings of fact as set out in its memorandum. Some were stipulated and others were generally undisputed. The legal conclusions drawn therefrom are contested here.

The Tax Court held that taxpayer's five grain storage facilities were *used in connection with* manufacturing and production as those terms are used in the statute. While not reaching the question of "furnishing transportation", it indicated in footnote 9, by dictum, it thought such use was at least arguable.

The Tax Court's findings establish the following narrative. Taxpayer is an Indiana corporation with its principal of-

---

1. The memorandum findings of fact and opinion entered by Judge Withey are reported at 50 T.C. No. 26.

2. 26 U.S.C.A. § 48 reads in relevant part:
"§ 48. Definitions; special rules
   (a)   Section 38 property.—
   (1)   In General.—Except as provided in this subsection, the term "section 38 property" means—
      (A)   tangible personal property, or
      (B)   other tangible property (not including a building and its structural components) but only if such property—

(i)   is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or
(ii)   constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or
* * *."

fice and place of business in Rushville, Illinois. It deals in four principal grains, viz: corn, wheat, oats and soybeans. Its business activities are concerned with a broad range of services related to harvesting, storing, processing, manufacturing, production and transportation of grain. It employs a fleet of vehicles for use in its business.

Taxpayer's business facilities are located on both sides of Wilson Street in Rushville. On the north side of Wilson Street, it owns about one acre of land. On this property were located the five concrete storage bins giving rise to the present controversy, together with a warehouse, a stoker coal pile and a storage facility. On the south side of Wilson Street, taxpayer leased land on which was located an office, a weighing scale, an old wooden elevator, feed grinding and mixing facilities, a small warehouse and five other storage bins, two of which contained grain dryers.

The five concrete storage bins which taxpayer built in 1964, on the north side of Wilson Street, are depreciable property with a useful life of 40 years and cost $43,321.03 to complete. Two of the bins are 24 feet wide by 80 feet high. The other three bins are 12 feet wide by 26 feet high. The two larger bins are each equipped with an aeration system capable of extracting two to three percentage points of moisture from the grain which has a normal moisture content of 20 to 22 percent.

Of the four grains handled by taxpayer, corn is by far the most important and presents a serious spoilage problem because of its normally high moisture content. It is acquired from local farmers and delivered to taxpayer either in the farmers' or taxpayer's trucks. The corn taken to taxpayer's facilities is aerated, most of it is dried and some is blended. The other grains generally receive the same treatment with less drying, mixing or blending.

Some corn, after it is aerated and dried, is ground into meal, mixed with protein supplements and sold as livestock feed. In that case, the corn is removed by truck from the aeration bins and elevated into the other storage bins containing drying equipment. Of taxpayer's gross sales for the taxable year in question, approximately eight percent was derived from the sale of grain which had been processed for and subsequently sold as livestock feed.

Most of the corn, which is not ground into meal and sold as feed, is sold to large grain elevators along the Illinois River. From these grain terminals, the corn is loaded onto barges which generally go to New Orleans and from there are loaded for export. All such corn is first aerated and then dried in the same manner as the corn which is prepared for feed.

Because of mechanical innovations in the development of new farm machinery and the improvement in more modern methods of farming, taxpayer has been required to expand its operations and storage facilities. A special combine has been perfected which can pick the corn and separate the kernels from the cob in the field in one operation. All corn is shelled for storage in the bins. Taxpayer has a sheller for use by any farmer without one.

One result of the modern method of harvesting and storing is that taxpayer acquires most of its corn from farmers during a peak season. This runs between 45 and 60 days, beginning about October 20 and ending about December 15. This modern practice necessitates a reduction in grain spoilage and creates an acute need for additional storage.

The Tax Court held, *inter alia*, that taxpayer's five storage bins were *used in connection with* the *production of grain*, one of the qualifying activities enumerated in Section 48, *supra*. In this respect, it is interesting to note that the Commissioner concedes and has ruled that where a farmer builds a grain storage facility to store his own grain or where he pays a fee to another for the use of the other's storage facility, the owner of the facility is allowed an investment tax credit. However, if the owner of the storage facility buys grain outright from a farmer and is not himself in

the farming business, as is the situation in the instant case, the Commissioner contends that the owner of the facility is not entitled to the tax credit.

Section 48 does not define "production." We are not concerned here with whether the storage facility was "used as an integral part" of production but rather with whether it was "used in connection with" production.

■ Reference is made to the relevant legislative history in the Tax Court memorandum on this subject. It is clear that basic to the statutory purpose is the desire "to provide a stimulant to the economic growth of this country", to increase "the profitability of productive investment by reducing the net cost of acquiring new equipment", and thereby to "stimulate investment in capacity expansion and modernization, contribute to growth of our productivity and output, and increase the competitiveness of American exports in world markets." [3]

■■ Not only are the Congressional purposes to be considered in construing the statute, but the relevant regulation is helpful. Section 1.48–1(d) (2) provides:

"For purposes of the credit allowed by section 38, the terms 'manufacturing', 'production', and 'extraction' include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. * * *"

■ The Tax Court found that, consistent with the regulation and the legislative purpose behind the investment tax credit, taxpayer's storage and handling of grain was as much involved in the activity of production as would have been the case had it been a farmer or leased space in the storage facilities to farmers. We agree that the regulation does not support the distinction the Commissioner seeks to make. We find no logical basis elsewhere for such a distinction.

The facts here demonstrate that taxpayer's business involves much more than mere buying, storing and selling the grain as the Commissioner seeks to limit it. For the purpose of shipping, including foreign export, it was necessary that the grain be aerated and dried. This was necessary to enable taxpayer to upgrade poor corn by blending it with good corn. It was required to prevent early spoilage. It was essential to the production of livestock feed. Without the use of the storage facilities, with their attendant aeration and drying processes, the grain could not have been put to its intended uses.

■ We conclude, as did the Tax Court, that considering taxpayer's business as an integrated operation, it is fair to find from the record as a whole that the storage facilities in question were used in connection with the activity of the production of grain as that word is used in Section 48.

■■ The Tax Court further found and held that the same rationale brought taxpayer's use of its storage facilities within reach of the activity of "manufacturing" as used in Section 48. We have serious doubt that this conclusion is justified on this record. By the same token we find little support in arguing that the storage facilities in question may be said to have been used in connection with "furnishing transportation."

Additionally, the Commissioner faults the Tax Court in striking down Revenue Rulings 67–220,[4] 68–122[5] and 68–132[6] as being inconsistent with Section 48 and Regulation 1.48–1(d) (2), *supra*. We need not reach that question here. Our

---

3. H.Rept.No.1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 411; S.Rept. No.1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707.

4. Rev.Rul. 67–220, 1967–2 Cum.Bull. 46.

5. Rev.Rul. 68–122, 1968–1 Cum.Bull. 10.

6. Rev.Rul. 68–132, 1968–1 Cum.Bull. 14.

examination of such rulings leads us to conclude they are distinguishable from the facts in the instant case and would not affect the result here.

In sum, under the facts of this case, we affirm the decision of the Tax Court on the narrow question of "production."

Affirmed.