**F. P. WOOD & SON OF ELIZABETH CITY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 598.**

United States District Court,
E. D. North Carolina,
Elizabeth City Division.

Aug. 11, 1970.

———◆———

Poyner, Geraghty, Hartsfield & Townsend, Newman A. Townsend, Jr. and Thomas L. Norris, Jr., Raleigh, N. C., for plaintiff.

G. Thaddeus Williams, Attorney, Tax Division Department of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

KELLAM, District Judge.

F. P. Wood & Son of Elizabeth City, Inc. (Wood) instituted this action on July 10, 1968, pursuant to 28 U.S.C. § 1346(a) (1), for the refund of federal income taxes for the fiscal years ended July 31, 1963, July 31, 1964, and July 31, 1965, in the amount of $14,270.85, plus interest. The action challenges the determination by the Commissioner of Internal Revenue denying the investment tax credit claimed on a 250,000 bushel concrete grain storage facility installed with a 2,000 bushel dryer during Wood's 1966 fiscal year.

The question for decision is whether the grain storage facility qualifies for the investment credit against federal income tax as provided by Section 38 of the Internal Revenue Code. To qualify for the investment credit, Wood's facility must come within the classification of "Section 38 property" as defined by Section 48 of the Code. Wood contends that the grain storage facility is "Section 38 property" because it is used "in connection with" manufacturing, production, or extraction and as such qualifies for the investment credit.

The facts have been stipulated by the parties, and the legal conclusions are drawn from these facts. Wood, a North Carolina corporation, is now and was during the period involved, engaged in the business of storing, purchasing, drying, processing and selling grain. In this connection most of the grain comes from farmers living within a twenty-five mile radius of Elizabeth City.

Wood deals in several varieties of grain including corn, which amounts to 65% of its volume, and soybeans which amounts to 25% of its business. The remaining 10% is cereal grains including wheat, oats, barley, and rye. When grain is brought to Wood's storage facility, it is weighed and graded according to moisture content, test weight, amount of damage, and foreign material content. Then the grain is dumped into the appropriate storage bin. Frequently, various grades of a particular grain are blended to achieve a different grade. For example, No. 2 corn, the grade generally sold, has a permissible foreign material limit of 3%; by blending a bin of corn with a 5% foreign material content (No. 4 corn) with a bin of corn containing only 1% of foreign material (No. 1 corn), the result may reach a No. 2 corn. It is also possible to upgrade two bins of a particular grade of grain, depending upon particular grade factors.

After the grain has been graded, it must be dried to reduce its moisture

content. The actual drying process takes two or three hours, depending on the moisture reduction that is required. Drying is accomplished artificially by blowing hot air across the grain as it moves down the dryer, and the process is necessary to prevent grain from spoiling or molding. If the grain is not dried, it will be unfit for use in animal feed or food for human consumption. Wood's major grain, corn, has a moisture content of 20–25% at time of harvesting. The moisture must be reduced to 14–15% within 48 hours after the kernels have been removed from the cob to prevent spoilage. Local farmers do not have the facilities to accomplish this process so it must be done by Wood.

Once the grain has been dried, it must be cooled and cleaned by screening out foreign matter and cracked grains. This process is particularly important if the grain is to be later sold to a processor who will use it in human food products.

Stored grain must also be aerated periodically and this is accomplished by use of large fans located under each bin. These fans are permanent parts of the bins and pull fresh air from the top, through the bin and then exhaust the stale air out of the building. If the temperature in a particular bin rises to a certain level, the grain must be redryed and aerated to preserve it. After grain has been cleaned and dried, the bins are used for storage until the grain is sold. Grain is aerated as necessary to keep it in usable condition until that time.

In the grain business, a large number of bins is necessary, because several varieties of grain are handled and each type must be binned separately. Each grain has five different grades which must be binned separately also. The problem is further complicated since dried grain must be binned separately from undried grain.

Before 1966, Wood operated a 250,000 bushel concrete grain storage facility consisting of twenty bins and a dryer. During its 1966 fiscal year, Wood built an additional 250,000 bushel storage facility with eighteen bins and also installed a 2,000 bushel dryer. The total cost was $315,763.27, and the cost of the bins, exclusive of the dryer, was $248,490.57. The grain storage bins are depreciable property and had a useful life of twenty years when completed.

The new facility was built to accommodate Wood's customers. Over the last ten years the harvest period has been shortened by the invention and expanding use of the grain combine. This caused Wood to receive an increasing amount of grain each day until it was unable to handle and process the quantities available. As a result, Wood had to close its facility for as much as two days a week in order to keep up with its drying requirements. The effect of this action was to delay the harvest and lengthen the harvest period around Elizabeth City, because local farmers had to stop harvesting their grain until Wood had processed its earlier grain receipts and its drying facilities again became available.

An additional factor motivating Wood to expand its facilities was the requirement that he keep the grain in storage over longer periods of time due to marketing conditions, and because transportation means had become more difficult to secure. The grain had to be stored until the farmers decided to market it, and until they were able to find some means to move it.

Wood is and was during the period involved a public warehouse, licensed by both the United States and North Carolina Warehouse Systems. Under the United States Warehouse Act, 7 U.S.C. § 241 et seq., Wood is required to accept grain from farmers if space is available. Wood also had and now has an agreement with the Commodity Credit Corporation to make its facilities available for local farmers to store grain which the United States is committed to purchase under the grain support price program.

During the period concerned, approximately 20% of Wood's storage facilities were used to store grain belonging to local farmers while the remaining 80% of the facilities were used to store

grain which Wood ultimately purchased. Grain stored was sold directly to domestic manufacturers or processors while the remaining 20% was sold for export. It should be noted that until the grain is properly dried and aerated, it cannot be stored or shipped in the domestic or export markets.

Wood's taxable income in 1966, was $29,859.55, and the federal income tax on this amount was $7,832.58. The investment credit claimed from construction of the grain storage facility is $14,270.85. On November 9, 1966, Wood filed claims for refund for its taxable years ended July 31, 1964, and July 31, 1965; and on November 16, 1966, Wood filed an additional refund claim for its taxable year ended July 31, 1963. In each claim, Wood asserted that it was entitled to an unused investment credit carry-back from its taxable year ended July 31, 1966, on the ground that the grain storage facility built in 1966 qualified for the investment tax credit. The refund claims were disallowed upon the Commissioner's determination that the grain storage bins did not qualify for the investment credit. The Commissioner did allow the investment credit for the dryer, so this controversy extends only to the grain storage facilities.

Wood's activities are substantially identical to those of the taxpayer in Commissioner of Internal Revenue v. Schuyler Grain Co., 411 F.2d 649 (7th Cir. 1969), in which the Seventh Circuit Court of Appeals held that a similar grain storage facility consisting of five bins was "Section 38 property" and, therefore, entitled to the investment tax credit. Wood argues that *Schuyler Grain* should be followed by this Court while the Commissioner contends that *Schuyler Grain* is erroneous and should not be followed.

Section 38 of the Internal Revenue Code provides that taxpayers are entitled to a credit against their federal income tax for certain qualified investments in property. Section 48 defines the type of property which qualified for the investment credit and, in pertinent part, provides:

(a) Section 38 property.—

(1) In general.—Except as provided in this subsection, the term 'section 38 property' means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i)

As applied here, a qualified investment within the definition of "Section 38 property" includes a grain storage facility which is "an integral part of manufacturing, production, or extraction, or of furnishing transportation. * * * " or which "constitutes a research or storage facility used in connection with" any of these activities.

The Code definitions have been expanded to some degree by the Commissioner's Federal Tax Regulations, and these are particularly useful in considering the construction of the statute. Section 1.48–1(d) (5) is relevant in this respect and provides:

If property (other than a building and its structural components) constitutes a research or storage facility and if it is used in connection with an activity specified in subparagraph (1) of this paragraph, such property may qualify as Section 38 property even though it is not used as an integral part of such activity. Examples of research facilities include wind tunnels and test stands. *Examples of storage facilities include oil and gas storage tanks and grain storage bins.* Although a research or storage facility must be used in connection with, for

example, a manufacturing process, the taxpayer-owner of such facility need not be engaged in the manufacturing process. (Emphasis added.)

It is clear that the property on which Wood claims the investment credit consists of grain storage bins and that this regulation specifically includes grain storage bins within the definition of "storage facilities." Furthermore, Regulations, § 1.48–1(e) (1) specifically excludes grain storage bins from the definition of "building"; "the term 'building' does not include such structures as * * * grain storage bins * * *" Accordingly, if Wood's grain storage facility is used "in connection with" either manufacturing or production, it will qualify as "Section 38 property." And as Regulations, § 1.48–1(d) (5) provides, the taxpayer need not be engaged in the manufacturing process; the facility need only be used "in connection with" that process. From the language of the Regulation, it is apparent that the same relation applies to the production process.

The question, then, is whether Wood's grain storage facility is used "in connection with" production or manufacturing.[1] In this respect, it should be noted that the Commissioner has conceded that a grain storage facility qualifies for the investment tax credit where a farmer builds it to store his own grain or where he pays a fee to use another's grain storage facility. See Rev.Rul. 68–282, Rev.Rul. 68–132, Rev.Rul. 68–122, and Rev.Rul. 67–220; See also *Schuyler Grain*, 411 F.2d at 651. The Commissioner contends, however, that if the owner of the storage facility buys grain directly from a farmer and is not himself engaged in farming operations, he is not entitled to the investment tax credit. In *Schuyler Grain*, both the Tax Court and the Court of Appeals hold that this distinction cannot be justified by the Code or the Regulations. On this point, the Court of Appeals stated:

> The Tax Court found that, consistent with the regulation and the legislative purpose behind the investment tax credit, taxpayer's storage and handling of grain was as much involved in the activity of production as would have been the case had it been a farmer or leased space in the storage facilities to farmers. We agree that the regulation does not support the distinction the Commissioner seeks to make. We find no logical basis elsewhere for such a distinction. 411 F.2d at 652.

Likewise, this Court sees no basis for the distinction. It is readily apparent that the operations which Wood performs are essential either as the last steps of the production process or as the first steps of the process of manufacturing the grain into animal feed or food for human consumption. In either case, because of the variety and grades of grain and the need for space, the storage bins are necessary to accomplish these operations. Accordingly, the storage bins are used "in connection with" a production or manufacturing process. Whether these operations are done by the farmers, Wood, or the actual manufacturers is immaterial. Furthermore, the stipulated facts show that approximately 20% of the grain stored in the bins belonged to local farmers rather than Wood. It is true that most of this grain was ultimately purchased by Wood, but for some amount of time, the grain storage bins were "leased" by the farmers in the sense that would permit the facility to qualify for the investment tax credit. Some amount of grain is always kept in Wood's facility under these circumstances. Neither the Code nor the Regulations indicates that the facility must be predominantly used in this manner; it is enough if a part of the

---

1. For the same reasons expressed in *Schuyler Grain*, 411 F.2d at 652, there is no purpose in dealing with the question of whether these facilities are used "in connection with" "furnishing transportation."

facility is so used. *Cf.* Northville Dock Corp. v. Commissioner, 52 T.C. 68 (1969), aff'd., 427 F.2d 164 (2d Cir. May 12, 1970).

In addition to *Schuyler Grain,* there are other relevant cases that bear on this particular situation. In *Northville Dock Corp.,* supra, the Court, relying on *Schuyler Grain,* held that where two grades of oil were blended to obtain a third grade, the oil storage tank was "Section 38 property," because the process was within the scope of manufacturing. We see no significant distinction between the oil blending operations performed in *Northville Dock Corp.* and the grain blending operations carried out by Wood. It is apparent that this blending must be done to get commercially usable grain and that the storage bins are needed to carry out these blending operations. Also, in United States v. Loami Grain Co., 69–2 U.S.T.C., para. 9543, 24 AFTR 2d 69–5222 (S.D. Ill.1969), and the three related cases, Sherley-Anderson-Rhea Elevator, Inc. v. United States; Sherley-Anderson-Lazbuddie Elevator, Inc. v. United States; and Pitman Grain Co. v. United States, 315 F.Supp. 1055, decided June 19, 1970 (N.D.Tex.), the courts allowed the investment credit on certain grain storage bins, citing *Schuyler Grain* as authority for their holding.

Reference to the legislative history of the investment tax credit provisions also indicates that the statute should not be construed as the Commissioner contends. The investment credit embodied in Section 38 was part and parcel of a program of economic reform. It was designed "to provide a stimulant to the economic growth of this Country" in line with President Kennedy's recommendations in his tax message to Congress. H.Rep. No. 1447, 87th Cong. 2d Sess., p. 1 (1962–3 Cum.Bull. 405). The objective of the tax credit was to increase the profitability of productive investment by reducing the net cost of acquiring new property. Specifically, the objective of this tax credit was to stimulate investment in this Country's productive capacity by encour-

aging expansion and modernization, contribute to the growth of productivity and output, and increase the competitiveness of American exports in the world market. The objective was to be realized through a reduction in the cost of acquiring new equipment. H.Rep. No. 1447, p. 7 (1962–3 Cum.Bull. 405, 411).

It is apparent to this Court that consistent with the Code, the legislative purpose behind the investment tax credit, the Federal Tax Regulations, and *Schuyler Grain,* Wood's grain storage facility and the operations it performs are as much involved in the activity of production as would be the case had Wood been engaged in farming operations or had farmers leased Wood's facility. Similarly, if Wood were actually engaged in the manufacturing process of breakfast cereal, or had a manufacturer of breakfast cereal used Wood's facility for drying and cleaning, the operations now carried on would be considered a necessary part of the process of preparing the grain for manufacture into feed or food products. In either case, the grain storage bins would be an essential part of the operations and, as such, used "in connection with" production or manufacturing as required by the statute. As it now is, Wood does the first phase of manufacture.

The facts demonstrate that Wood's business and operations amount to much more than the mere buying, storing, and selling of grain as the Commissioner contends. To obtain commercially usable grain, the grain must be dried, cleaned, graded, and various lots must frequently be blended before it can be used in either the domestic or export market. Because of the large quantities of grain involved, Wood's storage facilities are necessary to accomplish these processes. As the Court of Appeals found in *Schuyler Grain,* without the use of the grain storage facilities, the grain cannot be preserved and thus cannot be used for its intended purposes. Considering Wood's operations in light of the entire process from production to manufacture, the conclusion must be that the grain

storage bins are used "in connection with" the production and/or manufacture of grain or grain products as the terms are used in Section 48 of the Internal Revenue Code.

F. P. Wood & Son of Elizabeth City, Inc. is entitled to recover the agreed amount of $14,270.85, plus the statutory interest. If counsel cannot agree on the exact sum, each should within 20 days from this date submit their respective contentions in writing to the Court for determination. Likewise, counsel will within said 20 days present an appropriate order on judgment in this cause.