DOLPH AND THELMA S. SPALDING, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8064-73.    Filed September 9, 1976.

*Robert E. Kovacevich* and *Richard P. Algeo,* for the petitioners.

*Charles L. Eppright,* for the respondent.

HALL, *Judge:* Respondent determined a deficiency of $691.78 in petitioners' 1971 Federal income tax.

The sole issue is whether a fence erected by petitioners in 1971 to enclose a portion of their auto wrecking business qualifies as "section 38[1] property" for purposes of the investment credit.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Spokane, Wash., at the time they filed their petition.

Petitioners have been owners and operators of Spalding Auto & Truck Wrecking, a vehicle wrecking yard, for more than 40 years. They handle primarily automobiles and trucks, and, on occasion, airplanes and earthmoving equipment. Originally petitioners were located nearer the center of Spokane. In 1939 they moved to their present location in order to obtain more space and to lessen their losses from theft.

Petitioners' current location occupies an open, flat tract of land, approximately 20 acres in size. Except for fencing erected by the State of Washington to isolate a freeway from petitioners' property, the 20-acre tract is enclosed by a barbed wire fence. Approximately 5 acres are used as a dismantling area. The remaining 15 acres are used for storing the bodies of autos and trucks after they have been stripped of their salvageable parts.

Inside the dismantling area are several warehouses. After petitioners have purchased a vehicle, employees of the petitioners bring it inside one of the warehouses, use a hoist to lift it, and then disassemble the vehicle, including motor, carburetor, and transmission. The employees inspect the various parts to see if they are still serviceable; they then clean, identify, and store the useable parts for resale. Petitioners have no separate sales outlet. They use a portion of the yard as their sales area.

On occasion petitioners store vehicles in the dismantling area. For example, insurance companies have vehicles involved in accidents towed from the scene of the accident to petitioners' yard. If the insurance company decides the vehicle is worth repairing, then petitioners return it to the insurer. Sometimes a party to an accident stores a car with petitioners for use in litigation.

Prior to 1971, petitioners had frequently suffered theft losses. The two largest losses were the theft of three motors on one night and the theft of over a thousand dollars' worth of transmissions on another night. Petitioners experimented with a watchman but were dissatisfied with his performance.

In 1971 petitioners erected a fence around the dismantling area to attempt to curtail thievery. The fence was metal chain

link, 8 feet high, surmounted by three strands of barbed wire, and extending 3 feet into the ground. It was depreciable property with a useful life of 8 or more years. At night petitioners let out trained. patrol dogs within the dismantling area to provide further protection. The patrol dogs proved to be cheaper and more efficient than a watchman.

Although petitioners still suffer some theft losses during the day, they have suffered no nighttime losses since the erection of the fence and the use of patrol dogs.

On their 1971 income tax return, petitioners claimed an investment credit in relation to the chain link fence. Respondent disallowed this sum in its entirety.

## OPINION

In 1971 petitioners constructed an 8-foot chain link fence around that portion of their auto wrecking yard in which their employees dismantled autos and stored salvaged parts. The sole issue before us is whether this fence qualifies for the investment credit.

Petitioners contend that the fence qualifies because they are engaged in manufacturing or production and the fence is an integral part of this operation. Respondent denies both these assertions. We hold for petitioner on both points.

Section 38 entitles a taxpayer to claim a credit for investment in certain types of depreciable property defined in section 48.[2] In

---

[2] Sec. 48(a) provides:

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research facility used in connection with any of the activities referrred to in clause (i), or

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or

(C) elevators and escalators, but only if—

(i) the construction, reconstruction, or erection of the elevator or escalator is completed by the taxpayer after June 30, 1963, or

(ii) the elevator or escalator is acquired after June 30, 1963, and the original use of such elevator or escalator commences with the taxpayer and commences after such date.

Such term includes only property with respect to which depreciation (or amortization in

addition to tangible personal property, section 48 defines "section 38 property" to mean:

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

The parties have stipulated that the fence is depreciable property with a useful life greater than the minimum required by section 48(a). Furthermore, petitioners do not argue that the fence is "tangible personal property" within the meaning of section 48(a)(1)(A). Nor does the respondent argue that the fence is a building or its structural component, excluded under section 48(a)(1)(B). Neither party has questioned the validity of any regulations. They are at odds only over the question of whether petitioners come within section 48(a)(1)(B)(i) quoted above.

This Court and other courts have employed a liberal standard in construing the investment credit. E.g., *Lykes Bros. Steamship Co. v. United States,* 513 F.2d 1342, 1353 (Ct. Cl. 1975); *Sydney Mandler,* 65 T.C. 586, 591 (1975); *United Telecommunications, Inc.,* 65 T.C. 278, 289 (1975); *Schuyler Grain Co.,* 50 T.C. 265, 272 (1968), affd. 411 F.2d 649 (7th Cir. 1969).

To determine whether petitioners meet section 48(a)(1)(B)(i), we must answer two questions: (1) Are petitioners engaged in "manufacturing" or "production," and (2) is the fence "an integral part" of such activity?

"Manufacturing" or "production" seems to have various meanings in different contexts in the Code. For example, under section 954 (defining foreign base company income), foreign base company sales income includes certain income of a controlled foreign corporation derived from the sale of personal property "manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized." Sec. 954(d)(1)(A). The regulations define "manufactured, produced, or constructed" as (1) substantially transforming the property, or (2) where the operations conducted by the company are substantial in nature and generally considered to constitute manufacturing,

lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

production, or construction, or (3) where conversion costs are 20 percent or more of the total cost of goods sold. Packaging, repackaging, labeling, or minor assembling operations do not constitute manufacturing, production, or construction. Sec. 1.954-3(a)(4), Income Tax Regs. If the section 954 test were applied, petitioners would apparently not meet it. See sec. 1.954-3(a)(4)(iii), example (2), Income Tax Regs.

On the other hand, under section 341 (collapsible corporations), a collapsible corporation is one "formed or availed of principally for the manufacture, construction, or production of property," among other things. Here the regulations state that "a corporation shall be deemed to have manufactured, constructed [or] produced * * * property if it * * * engaged in the manufacture, construction or production of property to any extent." Sec. 1.341-2(a)(5), Income Tax Regs. The courts have interpreted this provision broadly, particularly the term "construction." See, e.g., *Farber v. Commissioner,* 312 F.2d 729, 734 (2d Cir. 1963), cert. denied 374 U.S. 828 (1963), affg. 36 T.C. 1142 (1961) (filing of application for zoning permits and mortgage guarantees, payment of fees, and payment for utility and water connections held construction); *Ellsworth Sterner,* 32 T.C. 1144, 1148-1149 (1959) (hiring mortgage broker and architect, application for FHA mortgage insurance, and negotiation of sales contract held construction). If the section 341 "to any extent" test were applied, petitioner apparently would meet it.

Therefore we conclude that "manufacturing" and "production" have no uniform generalized meaning in the Code and we must look to the purposes and legislative history of section 48 for their specific meaning here. The legislative history provides (Technical Explanation of H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 501, 516-517):

The terms "manufacturing," "production," "extraction," and the businesses of furnishing "transportation," "communications," "electrical energy," "gas," "water," or "sewage disposal" services are to be given their commonly accepted meaning. Thus, for example, manufacturing or production includes the construction, reconstruction, or making of property from or with scrap, salvage, or junk material, as well as from new or raw material, (1) by processing, manipulating, refining, or changing the form of an article, or (2) by combining or assembling two or more articles, and includes the cultivation of the soil and the raising of livestock and other farm produce. Section 38 property would include, for example, property used as an integral part of the extraction, processing, refining, and fabrication of minerals or mineral products; the

growing, raising, processing, and packing or packaging of foodstuffs; the operation of sawmills and the production of lumber and lumber products and other building materials; and the manufacture, treatment, and packaging of textiles, paper, leather goods, glass, etc. * * *

The regulations use almost identical language in defining "manufacturing" and "production." Sec. 1.48-1(d)(2), Income Tax Regs. We have previously held that this regulation, consistent with the legislative purpose behind the investment credit, defines manufacturing and production broadly and is to be liberally interpreted. *Northville Dock Co.,* 52 T.C. 68, 73 (1969), affd. per curiam 427 F.2d 164 (2d Cir. 1970); *Schuyler Grain Co.,* 50 T.C. 265, 272 (1968), affd. 411 F.2d 649 (7th Cir. 1969).

We conclude that petitioners' activities of disassembling, cleaning, and storing parts of discarded vehicles for later sale constitute "manufacturing" or "production" within the meaning of those terms as used in section 48. This activity is included in the "construction, reconstruction or making of property from or with scrap, salvage or junk material * * * by processing, manipulating, refining, or changing the form of an article." Petitioners produced useable parts from junk cars by processing scrap. The results of their labors were to increase the value of the scrap with which they began. This activity was productive and fits within the congressional purpose to encourage productivity.

The second question we must determine is whether petitioners' fence was used "as an integral part" of petitioners' manufacturing or production. Sec. 48(a)(1)(B)(i). Looking again to the legislative history we find (Technical Explanation of H. Rept. No. 1447, *supra,* 1962-3 C.B. at 517):

In order to qualify for the credit, property (other than tangible personal property and research or storage facilities used in the specified activities) must be used as an integral part of one or more of the specified activities. Thus, for example, section 38 property would ordinarily not include such assets as pavements, parking areas, advertising displays, outdoor lighting facilities, or swimming pools which, although used as a part of the overall business operation, are not used directly in the specified activities. Specific examples of qualifying property which normally would be used as an integral part of one of the specified activities are blast furnaces, oil and gas pipelines, and railroad tracks and signals. Fences will qualify as section 38 property where used as an integral part of a specified activity as, for example, where used in connection with the raising of livestock.

The regulations use the following test (sec. 1.48-1(d)(4), Income Tax Regs.):

Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing.

Respondent has taken the position that fences used in connection with livestock raising are used as an integral part of manufacturing or production. Rev. Rul. 66-89, 1966-1 C.B. 7. This includes fences used to confine livestock in pastures, fences within pastures to keep livestock out of hazardous areas, and fences used to keep livestock and other animals out of cultivated areas. Rev. Rul. 66-89, *supra.* On the other hand, respondent has ruled that fences surrounding a trucking terminal were not used directly in taxpayer's transportation activities but were merely incidental to the operation of the business. Rev. Rul. 68-1, 1968-1 C.B. 8. There was no indication in that ruling that such fences had been erected to prevent thievery. The same was true of a fence around a marine terminal facility which respondent contended was not used an an integral part of the transportation activity as "they [the chain link fence and a water distribution system] are inherently permanent structures related to general land improvements and not to the business activity." Rev. Rul. 68-280, 1968-1 C.B. 20, modified in other respects by Rev. Rul. 75-137, 1975-1 C.B. 74. Where safety of property and people was the purpose for firewalls around gasoline storage tanks in a refinery, however, respondent concluded that such walls were "'other tangible property' used directly in and essential to the completeness of the operation of the refinery." Rev. Rul. 68-347, 1968-2 C.B. 33. Cf. *Spartanburg Terminal Co.,* 66 T.C. 916 (1976).

We hold that petitioners' fence here was an integral part of their manufacturing and production activity. It was as prudent to have a fence to keep this property from being removed by thieves as it is to have a fence to keep cattle within a range or pasture. The cattle are self-propelled and therefore likely to wander away, but here petitioners had experienced constant theft losses

and had had to take numerous actions to deter such losses (e.g., they moved out of town, they erected a fence, and they purchased watchdogs). We are unable to see any logic or merit in drawing a fine line between a fence to keep property from wandering away by itself and a fence to keep thieves from carting it away. If one is "integral," the other is too.

We find confirmation for our conclusion in the recent case, *Yellow Freight System, Inc. v. United States,* an unreported case (W.D. Mo. 1975, 36 AFTR 2d 75-5280, 75-2 USTC par. 9580), revd. and remanded on other issues 76-2 USTC par. 9478 (8th Cir. 1976). In this case, the court held, inter alia, that chain link fences built around trucking terminals to prevent theft losses qualify as "integral parts" of transportation services, and the Government did not appeal this issue.

*Decision will be entered for the petitioners.*

