*Decision will be entered under Rule 155.*

GIANNINI PACKING CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6398–77.    Filed September 25, 1984.

*John J. McGregor*, for the petitioner.
*Patricia Anne Golembiewski*, for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficiencies in the petitioner's Federal income taxes of $10,267.12 for the

taxable year ended April 30, 1974, and $8,463.22 for the taxable year ended April 30, 1975. After concessions, the sole issue for decision is whether the structural elements of two rooms in a facility used to cool and preserve fresh fruit are eligible for the investment tax credit under section 38 of the Internal Revenue Code of 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Giannini Packing Corp., a California corporation, had its principal place of business in Dinuba, CA, at the time it filed its petition in this case. It filed its Federal income tax returns for the taxable years ended April 30, 1974, and April 30, 1975, with the Internal Revenue Service Center, Fresno, CA. We shall refer to a taxable year by the calendar year in which it ends.

The petitioner is engaged in the business of acquiring, processing, storing, and marketing fresh fruit consisting of nectarines, plums, peaches, and grapes. Its packing plant is located in Dinuba, CA, in the San Joaquin Valley. All fruit handled by the petitioner is grown on nearby ranches. Several of the ranches are owned by the petitioner or its president, LeRoy Giannini. Fruit picked at the ranches is placed in bins having a capacity of about 1,000 pounds each. Periodically throughout the harvest day, trucks collect the bins and deliver them to the petitioner's plant in Dinuba.

The petitioner's plant is a packing and storage facility consisting in large part of two "pre-cooling" rooms (rooms 1 and 2) and two holding rooms (rooms 3 and 4). Upon arrival from the ranches, the bins are moved into rooms 1 and 2 where the temperature of the fruit is reduced to approximately 45 to 50 degrees Fahrenheit. The day following their delivery, the bins are removed from such rooms and taken to an adjacent processing area which is connected to such rooms by a continuous concrete floor and continuous roof. In the processing area, the fruit is removed from the bins. Fruit which is of inferior quality is picked out and taken away. The remaining

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

fruit is sorted, washed, and packed in cardboard cartons which hold an average of 25 pounds of fruit apiece. Each carton has four vents measuring approximately 3½ inches by ⅜ inches on each of its four vertical sides. The vents allow rapid circulation of cold air through the cartons in order to cool the fruit, and they provide an escape for ethylene gas which is given off by the fruit during the natural ripening process and which would otherwise hasten further ripening. The cartons are then stacked on pallets. Each pallet holds a cube of 60 or 66 cartons of one generic type, variety, size, and grade of fruit. The upper surface of the pallet and the top of each carton, except those on the top row, are coated with glue so that each carton is glued to the carton above and below it. The cartons on the pallet are then banded with polyethylene straps. Thereafter, the pallets are moved into room 4.

Room 4 is 90 feet long, 61 feet wide, and 21 feet high. In room 4, the pallets are arranged in rows which are two pallets high and extend from the side walls toward the center of the room so that the vertical carton vents are aligned. Each row is lodged against a doorway, which opens through the first wall of a double wall. For air management purposes, polyethylene flaps are lowered from the ceiling over the top and protruding end of each row, and rubber tubing is placed along the floor and the doorways where the rows adjoin the doorways and between the upper and lower levels of the pallets.

Room 4 cools the fruit by a convection process. It has double walls on three sides. Refrigerated air is forced at high velocity by 10 ceiling fans down from the ceiling ports, through the vented cartons to the doors at the end of the rows, through the doors, back through the double walls to refrigeration equipment, and finally back to the fans again. The arrangement and sealing of the pallets and the opening and closing of the ceiling ports allow for the forced circulation of air within room 4, which induces a wind tunnel effect with a chill factor of 30 to 40 degrees Fahrenheit and reduces the temperature of the fruit to 29 to 33 degrees Fahrenheit within a few hours. Room 4 has a single sliding 8-by-12 foot insulated electric door similar to an ordinary refrigerator door which opens to the outside. Because the method used to cool the fruit in room 4 requires considerable space for air circulation, no more than 400 pallets are placed in room 4 at any one time. Room 4 is

also used several times each year as a pre-cooling room to handle overflow of bins from rooms 1 and 2 when deliveries of fruit from the ranches are heavy. However, generally, room 4 is used to cool fruit after it has been sorted, washed, and packed.

When the fruit has reached the desired temperature, it is ready for shipment and is removed immediately from room 4 in order to prevent dehydration and shriveling which would occur if the fruit remained in room 4. About 30 percent of the pallets are moved from room 4 directly into refrigerated railroad freight cars and refrigerated trucks. Pallets that are not immediately shipped are transferred into room 3, which adjoins room 4.

Room 3 is 108 feet long, 63 feet wide, and 21 feet high. In room 3, the pallets are stacked against side walls three pallets high. The top pallets rest on permanent metal racks. The purpose of room 3 is to maintain the fruit at the temperature reached in room 4 and to maintain the appearance and quality of the fruit. Room 3 utilizes a "quiet air" method designed to minimize the deterioration of the fruit's appearance due to loss of moisture over an extended period of time. Refrigerated air enters at the ceiling along the double walls and is gently circulated to the center of the room where ducts are located. Air returning to the refrigeration equipment is carried through ductwork rather than through false walls. The "forced air" method of cooling utilized in room 4 tends to draw moisture out of the fruit if it is left there for periods longer than a few days. The cooling method utilized in room 3 keeps the air fairly motionless and permits the fruit to remain cool without significant loss of moisture. Approximately 1,250 pallets can be stored in room 3. Most fruit is shipped from room 3 on the same day that it is placed there, although fruit can be held for as long as 2 weeks to 5 months, depending on the generic type of fruit.

At the time they were constructed, rooms 3 and 4 were innovative and unique in the fruit-processing industry. Both holding rooms are specially designed and solely utilized to refrigerate and preserve fresh fruit. None of the storage in the holding rooms is related to any essential aging or sweetening of the fruit; the rooms are designed to retard the natural ripening process. Neither holding room can reasonably or

economically be converted to any other use. No portion of the holding rooms is designed for shelter or working space for humans. Human activity in the holding rooms is limited to the deposit and removal of the pallets.

Refrigeration is the only way to retard spoilage of the petitioner's fruit, extend its shelf life, and make it acceptable to the trade. The petitioner's customers will accept fruit for shipping only when the refrigeration process performed in room 4 is complete and only if the coolness of the fruit is preserved by room 3. The temperature of the fruit is sometimes tested both before and during shipment, as well as upon arrival.

The petitioner markets its fruit directly and through brokers to jobbers and wholesalers located throughout the United States and abroad. The petitioner's fruit is sold and shipped only by the pallet. During the taxable years in issue, the petitioner processed, packed, and shipped more than 25,000 pallets each year.

Both room 3 and room 4 have useful lives in excess of 7 years. The petitioner placed room 3 in service during its 1974 taxable year, and it placed room 4 in service during its 1975 taxable year. The cost of constructing rooms 3 and 4 included structural, electric, and refrigeration costs. During its 1975 taxable year, the petitioner also remodeled rooms 1 and 2 by making structural, electrical, and refrigeration improvements and placed them in service in that year. The petitioner claimed the investment tax credit with respect to all of its costs incurred in improving rooms 1 and 2, and the credit so claimed was allowed by the Commissioner. The Commissioner also allowed the investment tax credit with respect to the costs incurred in constructing rooms 3 and 4, except that he disallowed that portion of the investment tax credit attributable to the costs of the structural elements of such rooms.

## OPINION

The sole issue for decision is whether the structural elements of two rooms in a facility used to cool and preserve fresh fruit qualify for the investment tax credit.

Section 38 allows a credit against tax for investments in certain types of property, described as "section 38 property." In relevant part, section 48(a) provides:

SEC. 48(a). SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction, or

\*      \*      \*      \*      \*      \*      \*

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities * * *

The parties have agreed that the structural elements of rooms 3 and 4 are not "buildings" as that term is used in section 48 since such rooms were designed and utilized solely for the cooling of fresh fruit and were not designed or utilized for human shelter or work space. Thus, the present case does not involve the question of whether the structural elements of rooms 3 and 4 constitute buildings or structural components thereof. See generally *Scott Paper Co. v. Commissioner*, 74 T.C. 137, 177–187 (1980); *Satrum v. Commissioner*, 62 T.C. 413, 415–418 (1974); *Catron v. Commissioner*, 50 T.C. 306, 309–317 (1968).

The petitioner argues that rooms 3 and 4 qualify as tangible property used as an "integral part of * * * production" under section 48(a)(1)(B)(i) because they perform a final cooling and conditioning process which prepares fresh produce for an extended period of storage or shipment by minimizing the chance of spoilage and preserving its appearance. In addition, the petitioner argues that rooms 3 and 4 constitute facilities used for the "bulk storage of fungible commodities" under section 48(a)(1)(B)(iii) because freely interchangeable pallets of fruit, which individually and collectively constitute a large mass, are stored in such rooms.

The Commissioner argues that rooms 3 and 4 do not qualify for the investment tax credit because neither room was used as an integral part of the production of produce as required by section 48(a)(1)(B)(i). He contends that the processing of the fruit was complete before the fruit was placed in rooms 3 and 4. In response to the petitioner's second argument, the Commissioner contends that during the years in issue, the petition-

er's predominant use of rooms 3 and 4 was for the storage of fruit that had been sorted and boxed and that under section 1.48–1(d)(5)(ii), Income Tax Regs., such rooms do not qualify as facilities used for the bulk storage of fungible commodities.

The Commissioner has issued regulations which define the term "production" as follows:

> (2) *Manufacturing, production, and extraction.* For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, * * *. Thus, section 38 property would include, for example, property used as an integral part of the * * * processing of meat, fish, or other foodstuffs; * * * [Sec. 1.48–1(d)(2), Income Tax Regs.]

He has also issued regulations which define. when property is used as an "integral part" of production:

> Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer * * * in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. * * * [Sec. 1.48–1(d)(4), Income Tax Regs.]

In a number of cases, the controlling of atmospheric conditions has been recognized to be a part of the production processes. See, e.g., *Commissioner v. Schuyler Grain Co.*, 411 F.2d 649 (7th Cir. 1969), affg. 50 T.C. 265 (1968); *F.P. Wood & Son of Elizabeth City, Inc. v. United States*, 314 F. Supp. 1205 (E.D. N.C. 1970); *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263 (1974). Several of the cases have specifically recognized that the controlling of atmospheric conditions is essential to the production of agricultural products and the preparation of such products for shipment and that such activity is therefore a part of the production process. *Commissioner v. Schuyler Grain Co.*, 411 F.2d at 652, 50 T.C. at 272–273; *Brown-Forman Distillers Corp. v. United States*, 499 F.2d at 1272–1273; see also *Catron v. Commissioner*, 50 T.C. at 316 n. 7.

In *Central Citrus Co. v. Commissioner*, 58 T.C. 365, 369 (1972), we held that "processing compartments, commonly

referred to as sweet rooms, wherein fruit while stored was subjected to various controlled atmospheric conditions so as to govern its quality prior to packaging" qualified for the investment tax credit. We first rejected the Commissioner's contention that such rooms were "buildings" within the meaning of section 48. Our conclusion was that the "sweet rooms" qualified as section 38 property either because such rooms qualified as a storage facility or because such rooms were "other tangible property * *· * used as an integral part of manufacturing, [or] production." With respect to the latter conclusion, we stated: "Clearly, petitioner's sweet rooms conform precisely to the above-quoted regulations [sec. 1.48–1(d)(2) and (4), Income Tax Regs.]; their controlled conditions were absolutely necessary in governing shrinkage, ripening, color, and the overall quality of the fruit." *Central Citrus Co. v. Commissioner, supra* at 372–373.

The Commissioner contends that the facts in the present case are distinguishable from those in *Central Citrus Co. v. Commissioner, supra*. He stresses that in the present case, the fruit was placed in rooms 3 and 4 after it had been processed and packaged; whereas in *Central Citrus Co.*, the fruit was placed in the sweet rooms before processing and packaging was completed. The Commissioner describes room 4 as a holding area for fruit which had already been processed. He contends that the processing of the fruit included sorting, washing, and packing the fruit in cartons and incorporating the cartons into pallets. He similarly describes room 3 as a holding area and points out that neither room was related to any essential aging or "sweetening" of the fruit. Thus, he argues that neither room 3 nor room 4 was used as an integral part of the production of fruit.

We cannot agree. At the time they were constructed, rooms 3 and 4 were innovative and unique in the fruit-processing industry. We believe that room 3 and room 4 conform precisely to what the regulations describe as an "integral part of * * * production." See *Central Citrus Co. v. Commissioner, supra*. They were used "directly in the activity" and were "essential to the completeness of the activity."

There is no basis for the Commissioner's contention that the cooling of the fruit must occur prior to packaging in order to qualify as an integral part of production. It is undisputed that

the cooling of the fruit was one of the most important aspects of the petitioner's processing of the fruit. Room 4 rapidly brought the temperature of the fruit down from 45 to 50 degrees Fahrenheit to 29 to 33 degrees Fahrenheit. After removal of the fruit from room 4, room 3 maintained the desired temperature of the fruit and prevented it from dehydrating and shriveling, which would have occurred if the fruit had remained in room 4. Thus, both rooms were necessary to prepare the fruit for shipment. The petitioner's president was emphatic in his testimony that the temperature of the fruit was critical in his industry. The importance of proper cooling is also evidenced by the fact that the petitioner's customers would only accept fruit that had been properly cooled, and sometimes the temperature of the fruit was checked prior to and during shipment, as well as upon arrival. Under such circumstances, it is clear that rooms 3 and 4 were an integral part of the petitioner's production of fresh fruit. See *Commissioner v. Schuyler Grain Co., supra; Brown-Forman Distillers Corp. v. United States, supra; Central Citrus Co. v. Commissioner*, 58 T.C. at 372–373; *Catron v. Commissioner, supra*. Accordingly, we hold that the structural elements of rooms 3 and 4 constitute "section 38 property" for purposes of the investment tax credit. In view of our holding, it is unnecessary to consider the parties' alternative arguments. Because of other adjustments in the notice of deficiency,

*Decision will be entered under Rule 155.*