SCHUYLER GRAIN COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6141–65. Filed May 8, 1968.

*Robert E. Johnson,* for the petitioner.
*Wayne I. Chertow,* for the respondent.

WITHEY, *Judge:* The respondent determined a deficiency in petitioner's income tax for its fiscal year ended August 31, 1964, in the amount of $2,319.10.

The sole issue presented is whether petitioner's five grain storage bins constructed in the year in question were "used in connection with" any of the activities specified in section 48(a)(1)(B)(i) of the Internal Revenue Code of 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Schuyler Grain Company, Inc. (hereinafter referred to as petitioner), was incorporated on July 27, 1960, under the laws of the State of Illinois, and at the time of trial was in existence and doing business with its principal office at Rushville, Ill. Petitioner filed its corporate income tax return for the taxable year ended August 31, 1964, with the district director of internal revenue, Springfield, Ill.

Petitioner's business activities are diverse and encompass a broad range of services related to the harvesting, storing, processing, manufacturing, and transportation of grain. Petitioner employs a fleet of vehicles for use in its business consisting of three grain trucks, a Chevrolet ton and a half truck with a grain box on the back, a 36-foot grain trailer, an auger truck for delivering feed, a small pickup truck, and a truck with a permanently mounted corn sheller.

Petitioner's facilities are located on two parcels of land which are separated by Wilson Street. On the north side of Wilson Street, petitioner owns less than an acre of land which, at the time of trial, contained a warehouse, a stoker coal pile, a storage facility, and the five concrete grain storage bins constructed in 1964. On the south side of Wilson Street, petitioner leases land on which, at the time of trial, was located an office, a weighing scale, an old wooden elevator, food-grinding and -mixing facilities, a small warehouse, and five grain storage bins, two of which contain grain dryers.

During petitioner's taxable year ended August 31, 1964, petitioner began and completed construction of the five concrete grain storage bins located on the north side of Wilson Street. The bins are depreciable property, had a useful life of 40 years when completed, and were built at a total cost of $43,321.03. Two of the bins are 24 feet wide by 80 feet high and the remaining three bins are approximately 12 feet wide by 26 feet high. The two larger bins are each equipped with an aeration system which consists of a 14-foot tube, with holes, that runs

---

[1] All statutory references are to the Internal Revenue Code of 1954.

along the floor of each bin. The tube is connected to an exhaust fan on the outside of the building. When the fan is turned on, it pulls air from the top of the bin down through the grain, then into the tube, and finally out the exhaust fan. Continuous operation of the aeration system can extract approximately 2 to 3 percentage points of moisture from the grain. The aeration system is used on all corn stored by petitioner and is needed to retard spoilage until the corn can be further dried and processed into livestock feed or trucked to nearby grain terminals, located on the Illinois River, for shipment to New Orleans.

Petitioner deals in four principal grains, corn, wheat, oats, and soybeans. Of these, corn presents the most serious spoilage problem due to its normally high-moisture content. When the corn is brought to petitioner's facilities, either by the farmer or by petitioner's trucks, it is elevated into storage bins and aerated to lower the moisture content several percentage points from the usual 20 to 22 percent. If the corn is to be made into feed, it is taken by truck from the aeration bins and elevated into storage bins containing drying equipment. The drying bins further reduce the corn's moisture content to about 14 or 15 percent.[2] The corn is then ground into meal and mixed with protein supplements in order to produce feed for livestock. The feed is then sold to farmers who either pick it up at petitioner's facilities or have petitioner deliver it to their farms.

If the corn is to be transported to a river grain terminal, it is first aerated and dried in the same manner as corn which is prepared for feed. When the corn is ready for shipment to the terminal, it is loaded onto petitioner's grain trailer and pulled by a leased tractor to the terminal. Petitioner's largest dollar volume purchaser of corn is Farmers Terminal, a grain terminal company located on the Illinois River approximately 8 miles from petitioner's facilities. In the year in question, Farmers Terminal purchased in excess of 50 percent of the total dollar amount of all grain sold by petitioner. Other grain terminals which buy from petitioner are located on the Illinois River approximately 30 miles from petitioner's facilities. At the grain terminals the corn is loaded onto barges which generally go to New Orleans and from there the grain is loaded aboard ships for export.

As a result of mechanical innovations in harvesting machinery within the past 8 to 10 years, it is now possible, by means of a specially designed combine to separate the kernels of corn from the cob in the field. The shelled corn is then taken by truck to a storage facility. In the event a farmer does not possess a combine which can shell corn in the field, petitioner maintains its own shelling machinery which can be

---

[2] Oats, wheat, and soybeans require less handling than corn and generally do not have to be dried.

transported to the farm if the farmer desires. If the moisture content of the shelled corn is as low as 14 percent, the shelled corn can be stored on the farm. Otherwise, it is taken to a storage facility to be dried. Before the development of such a combine, it was necessary for the farmer to pick the ears of corn and then store them until they could be shelled. By enabling the farmer to combine several operations into one, it has become possible not only to reduce spoilage but to lessen the time needed for harvesting, with the result that the marketing year for corn, at least as it applies to petitioner's business, was reduced from 12 months to a peak season lasting between 45 and 60 days beginning about October 20 and ending about December 15. As a result of this shorter marketing period, as well as higher corn production caused by increased fertilization and better corn seed, it became necessary for petitioner to increase its grain storage facilities from a capacity of 65,000 bushels in 1960 to approximately 385,000 bushels by 1966. Of this capacity increase, 60,000 bushels were added in 1964 by the construction of the five bins in question.

Of the $1,225,951.03 in gross sales reported by petitioner for the taxable year in question, approximately $100,000 of that amount, or about 8 percent, was derived from the sale of grain which was purchased by petitioner, processed, and subsequently sold as livestock feed. The balance of petitioner's gross sales in its fiscal year 1964 was derived from the sale of grain, as distinguished from feed. With regard to the corn which is sold by petitioner to grain terminals on the Illinois River, all has been aerated, most has been dried, and some has been blended.[3] As to the wheat, oats, and soybeans sold by petitioner to the grain terminals, all has been aerated, some has been dried, and only a small amount, if any, is mixed or blended.

In its tax return for the year ended August 31, 1964, petitioner claimed an investment tax credit of $3,175.01, of which amount $2,319.10 was attributable to the five grain storage bins in question. Respondent disallowed $2,319.10 of the claimed credit on the ground that the storage bins in question did not constitute section 38 property.

OPINION

Section 38 of the Code provides that a taxpayer is allowed a credit against his income tax for qualified investment in property. The type of property which qualifies for this investment tax credit is called

---

[3] One aspect of petitioner's business involves the upgrading of corn which has gone "out of condition." This is achieved by blending a small quantity of "poor" corn with large quantities of "good" corn.

"section 38 property" and is defined in section 48 of the Code.[4] Basically, section 38 property must be depreciable property with a useful life of 4 years or more. In addition, if the property is not tangible personal property, as is the situation in the instant case, it can qualify for the tax credit only provided it constitutes tangible property other than a building and is either "an integral part of" manufacturing, production, extraction, or furnishing transportation [5] or is a research or storage facility which is "used in connection with" one or more of the aforementioned activities. The Commissioner's regulations specifically provide that a "storage facility" as used in section 48(a)(1)(B)(ii) of the Code encompasses a grain storage bin. Section 1.48–1(d)(5) of the Income Tax Regulations further provides that grain storage bins are not within the intended meaning of a "building," as that term is used in section 1.48–1(e)(1). Since we have found that the five bins in question were depreciable property having a useful life of 4 years or more and since the regulations provide and respondent concedes that the bins are encompassed within the term "storage facility," it follows that petitioner was entitled to the investment tax credit provided the bins were used "in connection with" manufacturing, production, extraction, or furnishing transportation.[6]

Respondent's basic contention is that the five grain storage facilities in question were not "used in connection with" any of the required activities enumerated in section 48. He attempts to support this position with numerous arguments, the more significant of which will be discussed below. However, before turning to a consideration of those arguments, we think it important to briefly discuss the legislative pur-

---

[4] SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or

\*       \*       \*       \*       \*       \*       \*

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

[5] While sec. 48 includes other activities, the parties concede that such other activities have no application to the facts in this case.

[6] While petitioner, under sec. 48(a)(1)(B)(i) would be similarly entitled to the tax credit if the storage facilities constituted "an integral part of" any of the specified activities, we need not consider that possibility inasmuch as the use of these facilities "in connection with" the specified activities constitute a more liberal rule under the facts presented herein.

pose behind the investment tax credit. The legislation which introduced the concept of the investment tax credit, Act of October 16, 1962, Pub. L. 87–834, 76 Stat. 960, was designed "to provide a stimulant to the economic growth of this country" [7] and as such reflected a desire, as outlined in the President's 1962 Economic Report, to increase "the profitability of productive investment by reducing the net cost of acquiring new equipment" and thereby to "stimulate investment in capacity expansion and modernization, contribute to growth of our productivity and output, and increase the competitiveness of American exports in world markets." [8] In light of this background, we think it clear that in determining whether the storage facilities in question were "used in connection with" any of the required section 48 activities, we must construe the statute with those purposes in mind.

At the outset, respondent contends that petitioner's primary business involved the mere purchase, storage, and sale of grain and therefore did not satisfy any of the required activities found in section 48. While respondent recognizes that approximately 8 percent of petitioner's dollar volume of business during the year in question was derived from the manufacture of livestock feed, he attempts to relegate this fact to obscurity by arguing that this activity was only an incidental part of petitioner's primary business of buying and selling grain. Respondent thereby attempts to impose a "primary use" rule to section 38 property where none is provided for either in the statute or in the regulations. However, we need not consider the merits of such an argument inasmuch as we conclude that the five bins in question were used "in connection with" at least some of the activities enumerated in section 48.

One aspect of petitioner's business which we think falls within the ambit of "manufacturing," aside from the manufacturing of livestock feed, is the drying process whereby moisture is removed from most of the corn and some of the other grains. The moisture content of the grain so treated is substantially reduced, thereby changing the characteristics of the grain and permitting its often lengthy shipment without serious threat of spoilage. Respondent, however, takes the position that even conceding the drying process is a form of manufacturing, there is insufficient evidence in the record from which we may conclude that the five bins in question were used to store grain which was later put through the drying process. This argument is based upon respondent's speculation that since the five bins in question were located across the roadway from the drying equipment and since there were other

---

[7] H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707.

[8] H. Rept. No. 1447, *supra*, 1962–3 C.B. 411.

grain storage facilities closer to and on the same side of the roadway as the drying equipment, petitioner would only use the storage facilities in closer proximity to the drying equipment for storing grain which had to be dried while using the five bins in question for grain which required no drying. While such an argument may find support in the art of logic, it finds no support in the facts in this case. We find nothing in the record which indicates that during the year in question petitioner always had sufficient storage areas on the south side of the roadway, where the dryers were located, to store all or most of the grain which had to be dried. To the contrary, the facts show that over the years petitioner was required to continually increase his grain storage facilities because of improvements in corn harvesting machinery which had the effect of compacting the corn harvesting season from the full year to 1½ to 2 months. Since the shortened harvesting season for corn, as well as larger corn crops, was a substantial cause for increasing petitioner's storage facilities, and since corn was the grain which principally required the drying process, we think it reasonable to assume that the corn, as well as other grains which were put through the drying process, were stored not only in facilities contiguous to the drying equipment, but also in petitioner's other storage facilities, including the five bins in question. While the testimony of petitioner's president is not entirely clear on this point, a reasonable interpretation of that testimony indicates that grain was frequently transported by petitioner's trucks from the storage facilities in question, located on the north side of the roadway, to the drying and food-grinding facilities on the south side, thereby reinforcing the proposition that the five storage facilities were used in connection with the drying process.

Respondent further contends that since petitioner is not in the farming business and does not store grain for farmers on a fee basis, the storage facilities could not, ipso facto, have been used in connection with "production," citing as support for this proposition Rev. Rul. 67–220, 1967–2 C.B. 46. Thus, respondent apparently takes the position that in the situation where a farmer builds a grain storage facility to store his own grain or where he pays a fee to another for the use of the other's storage facility, the owner of the facility is allowed an investment tax credit. However, if the owner of the storage facility buys grain outright from a farmer and is not himself in the farming business, as is the situation in the instant case, the owner of the facility is not entitled to the tax credit. While such a distinction is reflected not only in Rev. Rul. 67–220, *supra*, but even more recently in Rev. Ruls. 68–122, 1968–1 C.B. 10, and 68–132, 1968–1 C.B. 14,

we do not think the distinction can be justified either by the Code provisions or the regulations thereunder. Although section 48 is silent as to what constitutes "production," the relevant regulation is not so vague. Section 1.48–1(d)(2) provides that:

For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of the extracting, processing, or refining of metallic and nonmetallic minerals, including oil, gas, rock, marble, or slate; the construction of roads, bridges, or housing; the processing of meat, fish or other foodstuffs; the cultivation of orchards, gardens, or nurseries; the operation of sawmills, the production of lumber, lumber products or other building materials; the fabrication or treatment of textiles, paper, leather goods, or glass; and the rebuilding, as distinguished from the mere repairing, of machinery.

It is clear from this regulation that the Commissioner has chosen, consistent with the legislative purpose behind the investment tax credit, to define the activities of manufacturing, production, and extraction broadly. In light of this fact, we think it follows that petitioner's storage and handling of grain was as much involved in the activity of production as would have been the case had he been a farmer or leased space in the storage facilities in question to farmers. Section 1.48–1(d)(2), Income Tax Regs., does not support the distinction which respondent seeks to make and he has failed to otherwise explain the basis for such a distinction. The language used in the relevant regulation provides that manufacturing, production and extraction include "the making of property * * * from new or raw material, by processing * * * or changing the form of an article." The facts before us disclose that petitioner's business involves much more than the mere buying, storing, and selling of grain as respondent so strenuously contends. Among other activities conducted by petitioner's business, all grain was aerated, most corn and some amount of other grains were put through a drying process which substantially changed the characteristics of the grain for purposes of shipping, poor corn was upgraded by blending it with good corn, and livestock feed was manufactured by grinding corn and mixing it with protein supplements. Thus petitioner's business, when considered as an integrated operation, consisted of numerous activities which we think were intended to be included within the words "manufacturing" and "production," as these words were used in section 48. We think it equally evident from a thorough consideration of the record that the storage facilities in question were used "in connection with" those activities

and for that reason we must hold that petitioner was entitled to the investment tax credit on those facilities during the year in question.[9]

*Decision will be entered for the petitioner.*

---

[9] In light of our determination above, it is not necessary to decide whether the storage facilities in question were also used in connection with "furnishing transportation," as provided in sec. 48. However, considering the size of petitioner's fleet of trucks and trailers used by it to bring grain to its facilities, to move grain from place to place on its premises, and finally to deliver the grain and feed to the farmers and grain elevators on the Illinois River, we think it arguable that the storage facilities were used "in connection with" furnishing transportation if not "used as an integral part of" that activity, either of which criteria would subject the facilities to the preferential tax treatment provided by sec. 38.