GARNAC GRAIN CO., INC., ET AL,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 35832-85, 8213-86,     Filed July 3, 1990.
7840-87, 7848-87.

---

[1]Cases of the following petitioners are consolidated herewith: Garnac Grain Export Corp., Dissolved, docket No. 8213-86; Garnac Grain Co., Inc., docket No. 7840-87; and Garnac Grain Co., Inc., as transferee of Garnac Grain Export Corp., Dissolved, docket No. 7848-87.

*William L. Bricker, Jr., Turner P. Smith,* and *Donna L. Bregg,* for the petitioners in all docket numbers.

*Kathryn S. Reimann* and *Mark H. O'Donoghue,* for the petitioner in docket No. 35832-85.

*Sherry D. Spees,* for the petitioner in docket No. 8213-86.

*Anne Hintermeister, William H. Stoddard III,* and *Marcie B. Harrison,* for the respondent.

COHEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 35832-85 | Garnac Grain Co. | 1974 | $4,323,538 |
| | | 1975 | 940,401 |
| | | 1976 | 1,234,496 |
| 8213-86 | Garnac Grain Export | 1974 | 5,188,318 |
| | | 1975 | 3,231,062 |
| | | 1976 | 2,922,375 |
| 7840-87 | Garnac Grain Co. | 1978 | 72,959 |
| | | 1979 | 147,050 |
| | | 1981 | [1]107,904 |
| 7848-87 | Garnac Grain Co., | 1977 | 423,579 |
| | Transferee | 1978 | 431,994 |
| | | 1979 | 489,178 |

[1]An unrelated issue, giving rise to a deficiency of $107,904 for 1981, was withdrawn by oral stipulation of the parties. As a result, respondent has conceded all deficiencies determined against Garnac Grain Co. for 1981.

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue.

After concessions, the issue remaining for decision is whether loans by Garnac Grain Export Corp. to Garnac Grain Co. qualify as "producer's loans" within the meaning of section 993(d) which depends on (1) whether Garnac Grain Co. was "engaged * * * in the manufacturing, production, growing, or extraction of export property" within the meaning of section 993(d)(1)(C) during the years in issue and (2) whether a balance sheet item entitled "Market

adjustments on open trades" is "property held for sale to customers" for the purposes of computing increased investment in export-related assets under section 993(d)(3).

FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. During the years in issue, Garnac Grain Co. (Garnac) was a New York corporation, and Garnac Grain Export Corp. (Export) was a Delaware corporation. At the time the petitions were filed, Garnac's principal place of business was in New York, New York. Export had been dissolved as a corporation and liquidated prior to the dates on which the deficiency notices were sent.

### Overview of the Grain Industry

A grain merchant in the United States is much more than simply a buyer and a seller of grain. A grain merchant uses technical engineering and operating skills in a competitive environment and depends on specialized, capital-intensive facilities. Grain merchants use these facilities to dry, clean, grade, and blend raw grain.

Grain is moved in bulk throughout the handling, storage, and processing system. It is transferred from place to place without a container. In most cases, the ownership of, or at least the responsibility for, the grain changes hands when it enters or is discharged from the grain elevator. This means that the elevator must be equipped to measure accurately the quantities and qualities of the grain entering and leaving the facility. Special equipment has been developed to facilitate accurate weighing, sampling, and testing of grain in elevators. The mechanical transport of grain within the elevator is done by means of specialized conveying and elevating equipment. This equipment, however, can be a source of breakage of the grain and of grain dust explosions.

The method for harvesting corn has gradually shifted from ear corn harvest, at moisture levels safe for storage, to harvesting with combines, where the standing ear corn is converted directly to shelled corn at moisture levels too

high for safe storage. Although rapid harvest at high moisture levels reduces field losses, it increases the damage to kernels and the possibility of spoilage. The high moisture level at which corn and other grains are harvested results in a product that is not safe for storage. Rapid drying is, therefore, essential to prevent fermentation, fungal and insect infestations, and molds. Drying also eliminates water that must otherwise be transported and thus is usually performed at the earliest possible point in the grain handling system.

Grain elevators provide drying services for farmers, and the elevators receive payment either in the form of purchase price discounts based on the moisture content of the grain or in the form of a drying charge. The drying system for a grain elevator involves several components, including the dryer itself, the control system, the fuel system, handling equipment to empty and fill the dryer, and grain holding capacity for wet grain.

Aeration is the movement of small amounts of air through a grain mass to prevent deterioration of stored grain from molds and insects. Aeration keeps the grain at a uniform cool temperature and also removes small amounts of moisture from the grain. Higher, uneven temperatures cause moisture movement and condensation within the stored grain that stimulates molds and insects. Neither molds nor insects, however, will thrive at temperatures below 45 degrees.

Cleaning is used to separate or "screen" out foreign matter and cracked grains from whole, dried grain. A by-product of cleaning operations on corn is corn screenings. Screenings are sold to feed lots and are occasionally mixed back into the exported grain. The average level of foreign material in a grain mass can be controlled more precisely by reblending pure screenings into clean grain than by mixing several streams of grain with varying foreign material content.

The cleaning system for a grain elevator involves several components, including the cleaning machines themselves, the control system, handling equipment to deliver grain to and from the cleaning system, and special bins for the unclean grain, the cleaned grain, and the screenings, the

by-products of the cleaning system. Dust control systems and dust holding bins are also required, because the cleaning process presents special dust explosion hazards.

Similarly, the fumigation system for a grain elevator involves several components, including the fumigation application equipment itself, the bins in which the fumigation is to take place, and air circulation equipment. All fumigants, whether liquid, gas, or solid pellets, change to gas and are only effective when the proper mixture of gas and air is maintained within the bin for an extended period of time. Thus, the bins in which fumigation is to take place must be sealed so as to be relatively gas tight. Fumigation involves the handling of toxic substances and, therefore, represents serious safety hazards.

Lots of grain are blended in order to standardize the grain so that it will meet Federal grading standards and customer specifications. Blending can change the moisture content, density, test weight, and overall physical characteristics of a particular grain lot. It can also change functional characteristics, such as oil content and protein levels, of the grain lot.

By mixing diverse lots of grain, the elevator operator attempts to arrive at large lots with uniform characteristics that are the average of the lots combined. Blending, however, is much more than the simple combining of two grain lots to reach an average. The uniformity of the larger lot is not assured to be better than the individual components because segregation may occur.

Blending requires sophisticated equipment to control flow rates and to collect samples for monitoring purposes. Grains with different quality factors are maintained in separate bins. Blending is accomplished by drawing grains with different qualities from the various bins into a collecting conveyor.

During the years in issue, grain was purchased and sold based on grades established by the U.S. Department of Agriculture and monitored by the Federal Grain Inspection Service (FGIS). For each grain there were several individual quality parameters that collectively were used to establish the numeric grade of grain. The numeric grade of a given lot of grain was set by the level of the worst factor. The

FGIS issued an official quality grade certificate at load out based on these standards.

The grading factors applicable during the years 1973 through 1976 measured the physical and biological condition of the grain sample: test weight per bushel; the presence and level of moisture, broken kernels, and foreign material; damage to the kernels; and appearance, odor, and the presence of unknown substances. Each grading factor was measured to a 10th of 1 percent.

Purchase specifications were stated in terms of a Federal grade number, with discounts levied on a factor-by-factor basis against lots that did not make the specified grade. No premiums were offered for quality in excess of specifications. The value of above-standard lots was for use as blending stock to mix with substandard lots that had been discounted. During the years in issue, most of the corn delivered to country elevators was grade No. 2 or better; most wheat and soybeans were grade No. 1 or better. At export, the majority of sales were No. 3 corn, No. 2 wheat, and No. 2 soybeans. For all grains, the broken-grain factor was the one most responsible for downgrading. In most export sales, the responsibility of the seller for the numerical grade ended at the time the vessel was loaded.

Lots of grain that conformed to a particular grade were fungible. The identity of the seller or ultimate purchaser was generally not maintained in the grain marketing system. During the years in issue, however, customers could request specific nongrade functional and physical characteristics for the grain they purchased through the use of identity-preserved (IP) contracts. Under the IP system, specific lots of grain were kept in separate storage bins in order to fulfill specific sales requirements. Grain purchased on an IP basis was more expensive than grain that was purchased on a non-IP basis.

### Overview of Garnac

Garnac was incorporated on December 7, 1937, as a privately held corporation under the name of Garnac Brokers, Inc. During the years in issue, Garnac was a worldwide grain merchant whose business consisted primarily of purchasing grain (soybeans, corn, and wheat); clean-

ing, drying, aerating, fumigating, and blending this grain; and then selling it for export to customers in 40 to 50 countries throughout the world.

Initially, Garnac acted as a broker in the import of South American linseed and other grain that, during the drought years of the mid-1930's, the U.S. grain belt was unable to supply. After a good harvest in 1937, Garnac began exporting corn from the United States, and in 1938 the name of the firm was changed to Garnac Grain Co., Inc.

In the early 1960's, in order to remain competitive in international trade, Garnac began to build its own export elevators to control better the logistics of moving grain by rail and interior waterways to ocean vessel ports. On January 15, 1963, Garnac entered into a joint venture agreement with Archer Daniels-Midland Co. (ADM) for the purpose of constructing a grain elevator facility at Destrehan, St. Charles Parish, Louisiana. The St. Charles grain elevator, located on the east bank of the Mississippi River 25 miles upriver from New Orleans, was completed in the fall of 1963.

On January 31, 1967, Midwestern Grain Co. (Midwestern) merged into Garnac. Midwestern's business was buying cash grains, primarily corn, wheat, and soybeans, for shipment by barge and rail to meet export commitments. In early 1967, Garnac established an office in Chicago, Illinois, to serve in handling futures orders and as a listening post for market information.

In the 1970's, Garnac began to expand its ownership of interior elevators in the Midwestern States. By 1979, it owned or leased and operated grain elevators at Beardstown, Orleans, Macomb, and Keithsburg, Illinois; Newburgh, Indiana; Lake Village, Arkansas; Burlington, Iowa; and Winona, Minnesota. During the years in issue, all of Garnac's elevators were licensed under the U.S. Warehouse Act or under applicable State law requiring licensing of warehouses. Garnac did not own any barges or railroad cars.

### Garnac's Operations

Each of Garnac's grain elevators consisted of a complex interconnection of weighing and measuring devices, truck

dumpers, conveyor belts, elevation legs, storage and aeration bins, dryer systems, cleaners, hydraulic gates for blending, heat detection and dust control systems, and bulk loading and off-loading equipment. All these devices were controlled from an electronically monitored control center. When grain was received at a Garnac elevator, it was first unloaded and weighed and then sampled to determine its grade and quality characteristics. It was then stored in bins with other grain of similar characteristics.

The grain received at Garnac's country elevators was typically unacceptable for the export end-user. The grain might have been too high in moisture content, have contained foreign material, or have been suffused with insects and pesticide residue. In addition, customers frequently requested additional offgrade or nongrade specifications. Even grain of acceptable quality might not have been present in sufficient quantity to fill a customer's order. Contracts calling for specifications other than those found in the Federal grade requirements or that deviated from the specified grade were not uncommon during the years in issue.

During the years in issue, Garnac's elevators dried grain by heating air with gas heaters to 200 to 220 degrees and forcing it through columns of grain flowing over racks of metal baffles. A dryer operator would sample the grain at half-hour intervals to determine the discharge speed, rate, and extent of drying. The dried grain was then transferred and elevated, by means of conveyor systems, to other bins for tempering.

Because of biochemical reactions and bacterial heating that occurs in stored grain masses, an elevator operator cannot produce dry grain by simply combining dry grain with wet grain. Consequently, as much as 70 percent of the corn received at Garnac's interior elevators was dried, depending upon the season and the wetness of the year. Wheat and soybeans, however, did not generally require drying.

To retard the growth of molds, the activity of insects, and the generation of fungi, Garnac aerated the stored grain by moving outside air through it. Garnac's aeration system

consisted of fans that moved the air and ducts that controlled the rate of the airflow.

Garnac cleaned grain by moving it over vibrating wire mesh screens adjusted with holes of different sizes. The holes allowed the undesired portion of the grain to fall through the mesh while the desired portion stayed on top. An inertial drive system created the vibrations that set the grain in motion. Approximately 90 percent of the corn passing through the St. Charles elevator was cleaned.

If insects were found in the grain, Garnac normally fumigated the grain by spraying chemicals onto it. Alternatively, a team of four men would suffuse phosphine gas through a vessel lot or a bin and seal it for 72 hours.

To meet Federal grading standards and customer specifications, Garnac would blend different grades of grain from various bins by opening and closing hydraulic gates located at the bottom of each bin. The bins were electronically controlled from a central control room, where the hydraulic gates could be opened and closed at calibrated sizes and rates. As the blended grain was loaded out, a small stream was diverted for sampling.

At the St. Charles elevator, the control room operator could keep track of the quality characteristics in each of 150 storage bins through the use of a "bin board." The bin board recorded lot size, grade factors, and other quality characteristics from which the operator made a "paper mix" prior to setting up the final blend. During the years in issue, almost all of the grain Garnac received was subjected to blending.

Garnac did not produce any soybean oil, flour, meal, cereal, or other items for human consumption from corn, wheat, or soybeans during the years in issue. Garnac did not produce any animal feed from wheat, corn, or soybeans during the years in issue.

On April 15, 1974, Garnac purchased approximately 13 acres of arable land in Springfield, Illinois. Beginning in 1974, Garnac leased the land to a farmer who grew soybeans for commercial resale. Pursuant to the terms of the agreement between Garnac and the lessee of the land, soybeans were grown on Garnac's Springfield, Illinois, land as follows:

| TYE | Bushels | Sales proceeds | Date of sale |
|---------|---------|----------------|--------------|
| 1/31/78 | 354 | $1,618 | 10/22/77 |
| 1/31/80 | 284 | 1,899 | 10/31/79 |

Garnac agreed to share the proceeds of the farmed crop with the farmer/lessee. No grain or soybeans were grown on Garnac's Springfield, Illinois, land during the years ended January 31, 1974 and 1975. Garnac first received rental shares in the crops grown on its Springfield, Illinois, land in 1977.

In July 1974, Garnac purchased approximately 40 acres of arable land in Davenport, Iowa. Pursuant to the terms of the agreement between Garnac and the lessee of the land, soybeans were grown on Garnac's Davenport, Iowa, land during the year ended January 31, 1981. On October 31, 1980, Garnac received $1,026 from the sale to third parties in the United States of soybeans grown on the Davenport, Iowa, land. No grain or soybeans were grown on Garnac's Davenport, Iowa, land in any previous year.

### Financial and Accounting Matters

During March 1974, Export made loans to Garnac as follows:

| Date | Amount |
|------|--------|
| Mar. 5, 1974 | $3,100,000 |
| Mar. 7, 1974 | 1,025,000 |
| Mar. 8, 1974 | 1,275,000 |
| Total | 5,400,000 |

Garnac executed three promissory notes in favor of Export. The notes were denominated "producer's loans," and the maturity dates of the notes were not more than 5 years from the dates the loans were made. Each loan, when added to the unpaid balance of all other loans made by Export, (a) did not exceed the accumulated DISC income of Export at the beginning of the month in which the loan was made, and (b) did not exceed the amount of the export-related assets limitations established by section 993(d)(2). As of March 31, 1979, these loans had been paid and were no longer assets of Export.

Both Garnac and Export adopted the accrual method of accounting. Garnac reported its income on a fiscal year

basis ending January 31, and Export reported its income on a fiscal year basis ending March 31. During the years in issue, Garnac owned all of the issued and outstanding shares of Export. Export elected to be treated as a Domestic International Sales Corporation (DISC).

The valuation of inventory usually is a significant item in a firm's financial presentation, and the method of valuing inventory must be disclosed. There are several methods for valuing inventories that conform to generally accepted accounting principles. A firm and its auditors must determine which method will fairly present the firm's financial position and results of operations.

The most widely accepted method of accounting for inventory for grain merchandising companies is the "mark-to-market" method of inventory valuation. Under the mark-to-market method, inventory on hand and inventory in transit are priced at market value. Similarly, open forward contracts, purchase and sales commitments for grain not yet shipped, are marked-to-market and any unrealized gain or loss is used to adjust the stated inventory value. Finally, futures positions are marked-to-market and any resulting gain or loss is reflected in income. Grain merchandisers, who use the mark-to-market method of inventory valuation, disclose their inventory valuation method on the balance sheet or in footnotes thereto and show the gain or loss on open trades as an adjustment in computing net inventory.

Garnac used the mark-to-market method for both financial reporting purposes and tax purposes. Garnac's balance sheet included "Inventory, at market," consisting of grain on hand and in transit stated at market value, in the amount of $32,272,337 and $19,961,283 for the fiscal years ended January 31, 1974 and 1975, respectively. The account "Inventory, at market" was Garnac's actual inventory of grain. Garnac referred to this grain as "stock inventory" in its internal records and referred to this grain as "inventory" in work papers used to prepare its tax returns. Garnac did not maintain an inventory for work-in-process on its financial books and records.

During the years in issue, Garnac reported as an asset "Advances on grain purchases," consisting of deposits paid with respect to grain to be delivered in the future. Garnac

reported as a liability "Advances on grain sales," consisting of deposits received in connection with sales of grain that was in transit to Garnac.

At yearend for each of the years in issue, Garnac had open forward contracts to buy and sell grain in specified amounts at specified prices for delivery in the future. Generally, Garnac did not make any payment to enter into open contracts. Payments were made when Garnac received a shipment of grain against an open purchase contract. Garnac would pay 95 percent of the value of the shipment and record the payment as an asset, either as inventory in transit or inventory at market.

Garnac's practice was to mark-to-market these open forward contracts, referred to as "position inventory," on a monthly basis. Garnac then computed either a net gain or a net loss and recorded that amount on its balance sheet as an asset or a liability designated "Market adjustments on open trades." These items were reported on Garnac's consolidated balance sheets as follows:

| Item | 1/31/74 | 1/31/75 |
|---|---|---|
| Advances on grain purchases | $46,351,722 | $26,122,392 |
| Advances on grain sales | (27,244,700) | (25,158,214) |
| Market adjustments on open trades | (31,205,795) | 5,403,559 |

The position inventory records, stock inventory records, and index of market prices were regular parts of Garnac's inventory tracking system.

On Schedules L of its Forms 1120, U.S. Corporation Income Tax Return, for the fiscal years ended January 31, 1974 and 1975, Garnac reported "Inventories" of $32,272,337 and $19,961,283, respectively. These amounts represented only Garnac's "stock inventory" consisting of grain on hand and in transit stated at market value. The financial statement items designated as "Advances on grain purchases," "Advances on grain sales," and "Market adjustments on open trades" were not included in the "Inventories" amount shown on Schedule L.

Advances on grain purchases were classified on Schedule L as "Trade notes and accounts receivable," and advances on grain sales were classified on Schedule L as "Other current liabilities." Similarly, market adjustments on open trades were included in "Trade notes and accounts receiv-

able" (net gain) or "Accounts payable" (net loss). Advances on grain sales of $27,244,700 and $25,158,214 for the fiscal years ended January 31, 1974 and 1975, respectively, were itemized in a separate schedule of "Other liabilities" attached to Schedule L.

The tax return classification of advances on grain purchases and sales as accounts receivable or current liabilities and the tax return classification of market adjustments on open trades as accounts receivable or accounts payable were due to the lack of more specific classifications on the tax return balance sheet. These tax return classifications were a longstanding practice by Garnac's management.

## ULTIMATE FINDINGS OF FACT

Garnac's grain storage and handling activities, including its drying, cleaning, aerating, blending, and fumigating operations, were substantial in nature.

Garnac's grain storage and handling activities are not generally considered in the industry to constitute production.

Garnac's balance sheet item entitled "Market adjustments on open trades" is not "property held for sale to customers."

During 1974, Garnac's investment in export-related assets did not increase by an amount in excess of $5,400,000.

## OPINION

The deficiencies in this case result from respondent's determination that Export does not qualify as a DISC as defined in section 992(a). In particular, respondent contends that Export did not satisfy the requirement in section 992(a)(1)(B) that 95 percent of its assets be "qualified export assets." Resolution of the issue depends on whether the loans receivable from Garnac, totaling $5,400,000 were "producer's loans" within the meaning of section 993(d).

Respondent's challenge to Export's status is twofold. First, respondent argues that Garnac was not engaged in production or any other activity that would qualify it as a producer. Second, respondent maintains that the loans by Export to Garnac did not qualify as producer's loans

because Garnac did not satisfy the increased investment requirement of section 993(d)(3). The first argument requires extensive analysis of the nature of Garnac's business as set forth in our findings of fact. The second argument is based on financial accounting and tax reporting aspects set out above.

Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; *Rockwell v. Commissioner*, 512 F.2d 882, 885-886 (9th Cir. 1975), affg. a Memorandum Opinion of this Court.

### *Statutory Requirements*

In general, a corporation that qualifies as a DISC is not taxable on its profits. The shareholders, however, are taxable currently on a portion of such profits, although they may defer taxation on the remaining portion of the profits until the profits are actually withdrawn from the DISC or until the corporation ceases to qualify as a DISC. *CWT Farms, Inc. v. Commissioner*, 79 T.C. 86, 90 (1982), affd. 755 F.2d 790 (11th Cir. 1985). To ensure that a DISC's tax-deferred profits are used for export activities, Congress provided strict requirements for qualification as a DISC. A corporation that elects DISC treatment must satisfy the income and assets tests set forth in section 992(a). *Thomas International Ltd. v. United States*, 773 F.2d 300, 301 (Fed. Cir. 1985).

One of the requirements for qualification as a DISC is that at least 95 percent of the assets of the corporation at the close of its taxable year must be "qualified export assets." Sec. 992(a)(1)(B). This test is designed to ensure that substantially all of the DISC's assets are devoted to exporting. *CWT Farms, Inc. v. Commissioner*, 79 T.C. at 91; H. Rept. 92-533 (1971), 1972-1 C.B. 498, 529. A DISC is permitted to loan its tax-deferred profits (termed accumulated DISC income) to a U.S. manufacturing company (usually the parent of the DISC) if certain limitations are satisfied. See sec. 993(d)(1)(C). These loans (termed "producer's loans") constitute qualified export assets of the DISC for purposes of satisfying the 95-percent test. Sec. 993(b)(5).

Section 993(d), as applicable during the years in issue, conditioned the characterization of "producer's loans" as follows:

(1) IN GENERAL.—An obligation, subject to the rules provided in paragraphs (2) and (3), shall be treated as arising out of a producer's loan if—

    (A) the loan, when added to the unpaid balance of all other producer's loans made by the DISC, does not exceed the accumulated DISC income at the beginning of the month in which the loan is made;

    (B) the obligation is evidenced by a note (or other evidence of indebtedness) with a stated maturity date not more than 5 years from the date of the loan;

    (C) the loan is made to a person engaged in the United States in the manufacturing, production, growing, or extraction of export property * * * (referred to hereinafter as the "borrower"); and

    (D) at the time of such loan it is designated as a producer's loan.

Although the Internal Revenue Code itself does not define what is meant by the term "production," section 1.993-3(c)(2)(i), (ii), and (iii), Income Tax Regs., defines "production" as follows:

(i) *In general.* For purposes of this section, property which is sold or leased by a person is considered to be manufactured or produced by such person if such property is manufactured or produced (within the meaning of either subdivision (ii), (iii), or (iv) of this subparagraph) by such person or by another person pursuant to a contract with such person. Except as provided in subdivision (iv) of this subparagraph, manufacture or production of property does not include assembly or packaging operations with respect to property.

(ii) *Substantial transformation.* Property is manufactured or produced by a person if such property is substantially transformed by such person. Examples of substantial transformation of property would include the conversion of woodpulp to paper, steel rods to screws and bolts, and the canning of fish.

(iii) *Operations generally considered to constitute manufacturing.* Property is manufactured or produced by a person if the operations performed by such person in connection with such property are substantial in nature and are generally considered to constitute the manufacture or production of property.

Additionally, if the process at issue involves merely the "assembly or packaging" of a product, it will not be considered production unless the assembly or packaging operations incur conversion costs in excess of 20 percent of the cost of goods sold. Sec. 1.993-3(c)(2)(iv), Income Tax Regs.

The determination as to whether a loan qualifies as a producer's loan is made at the time the loan was made. Sec. 1.993-4(a)(2)(vi), Income Tax Regs. A loan can qualify as a producer's loan only to the extent that the DISC is able to show that, during the year in which the loan was made, the borrower increased its investment in export-related assets for that year by an amount equal to the amount of the loan. Sec. 993(d)(3).

The export-related assets that must be shown to have increased are described in section 993(d)(2)(A), (B), and (C) as follows:

(A) the amount of the borrower's adjusted basis determined at the beginning of the borrower's taxable year in which the loan is made, in plant, machinery, and equipment, and supporting production facilities in the United States;

(B) the amount of the borrower's property held primarily for sale, lease, or rental, to customers in the ordinary course of trade or business, at the beginning of such taxable year; and

(C) the aggregate amount of the borrower's research and experimental expenditures (within the meaning of section 174) in the United States during all preceding taxable years beginning after December 31, 1971 * * *

The amount of property held primarily for sale "is determined under the methods of identifying and valuing inventory normally used by the borrower." Sec. 1.993-4(b)(2)(iii), Income Tax Regs.

The foregoing provisions of the statute and regulations establish the framework with which we are concerned in this opinion. Further details are set out below as they become relevant to the contentions of the parties and to our analysis.

## Production of Export Property

Petitioners argue that Garnac's grain elevator operations were substantial in nature and were generally considered the production of property within the meaning of section 1.993-3(c)(2)(iii), Income Tax Regs. Petitioners contend that, because Garnac was "engaged in * * * production [or] growing * * * of export property," loans made by Export to Garnac qualify as "producer's loans" pursuant to section 993.

Respondent argues that Garnac's grain storage and handling operations are not substantial in nature. Further, respondent contends that Garnac's operations are in the nature of assembly or packaging and are therefore excluded from the definition of production.

A. *The Evidence*

Garnac's chief engineer, Van Eyck, testified in detail as to the nature of the drying, cleaning, aerating, blending, and fumigating steps performed at Garnac's grain elevators. Each elevator was a large, capital-intensive, physical plant performing operations that required the skilled judgment of the operating personnel and the proper utilization of the plant and machinery to create a final product that would satisfy the specifications of Garnac's export customers.

Both parties presented expert reports and testimony of their expert witnesses on the subject of "production." All of the experts were well qualified to express opinions on the subject matter, and their backgrounds and experience were similar and to a large extent overlapping. The expert witnesses agreed that grain elevator operations required skill and judgment in order to deliver the quality and grading characteristics required by Government regulations and customer specifications.

Petitioners presented the reports and testimony of four expert witnesses: William C. Shuey (Shuey), Henry G. Lembeck (Lembeck), Lowell D. Hill (Hill), and Thomas A. Hieronymus (Hieronymus).

Shuey concluded that the pre-export processing of grain at country and export elevators, such as those operated by Garnac, "should properly be considered to be production." Shuey based his conclusion on his knowledge of the complexity of grain marketing. In particular, Shuey asserted that grain received directly from a farmer cannot be utilized by an export customer. Instead, the drying, blending, aerating, fumigating, and cleaning operations performed by Garnac and other elevator operators are necessary steps in the grain production industry. Shuey also based his conclusion on the strict inspection and grading standards imposed by the Federal Government to ensure that diverse qualities and conditions of grain will meet the specifications

and the uniformity required by various users throughout the world.

Shuey concluded that the complexity involved in the management and operation of a grain elevator in transforming raw grain into a product that would be suitable for worldwide customers exhibited the characteristics that are generally associated with production. Further, Shuey stated that there was "no good reason why Garnac's operation should not be considered production."

Lembeck concluded that Garnac "is presently and has since prior to 1974 been engaged in 'production' of marketable grain for sale to customers located in the United States and overseas." In reaching this conclusion, Lembeck gave special consideration to the design and operational characteristics that distinguish Garnac's operations from a simple storage or a pure marketing system.

Like Shuey, Lembeck testified that complex grain elevators, such as Garnac's, do much more than simply store grain. Specifically, these complex grain elevators carry out blending, drying, cleaning, aerating, and fumigating operations. The complexity of these operations requires automated control and safety systems as well as skilled personnel.

Lembeck concluded that grain merchants use their complex facilities to produce grains that will meet the widely varied requirements of their customers. He believed that this processing is essential to create products that are suitable for storage and eventual transport to a final destination. Thus, Lembeck concluded that "Garnac's operations are what is generally considered to be production."

Petitioners' experts Hill and Hieronymus prepared a joint report, but both experts testified as to the assumptions and methods used in arriving at their joint opinion. Based on their experiences in the grain industry, Hill and Hieronymus stated that they "believe that Garnac is engaged in what should generally be considered production." In their report, Hill and Hieronymus concentrated on the transformations in form, place, and time that take place as grain moves from the farm to the end-user. Specifically, they focused on changes in the grain mass rather than looking at changes in individual kernels.

Hill and Hieronymus concluded that the value of grain changes from the time of its receipt at a country elevator until it reaches its final destination and that each operation performed adds value to the grain. Specifically, value is added by changing the form of the grain mass, through drying, cleaning, and blending. Value is also added by changing the location of the grain mass from a point of original production to a point of final consumption. Finally, value is added by transferring the grain through time by appropriate storage methods.

Hill and Hieronymus concluded that Garnac, like other grain elevator operators, played an indispensable role in the grain processing industry. Because Garnac's operations can be viewed as transforming the grain in time, place, and form, Hill and Hieronymus believed that these operations can and should be considered production.

On cross-examination, however, Hill referred to farmers as "producers," and Hieronymus acknowledged that in the grain industry the term "production area" referred to a farm. Both experts also acknowledged at trial that the term "processing" as used in the grain industry refers to activities such as grinding corn into meal, extracting oil from soybeans, and milling flour rather than to Garnac's activities.

Respondent presented the expert reports and testimony of his experts Charles R. Hurburgh, Jr. (Hurburgh), E. Dean Baldwin (Baldwin), and Allan Q. Moore (Moore).

Hurburgh testified that Garnac's operations were not considered production in the grain industry. Specifically, Hurburgh believed that short-term storage, handling, and blending are  assembly-type operations. Similarly, he believed that inspection, drying, cleaning, fumigation, and aeration are quality control operations incident to maintaining a saleable product. Hurburgh concluded that, rather than removing or curing sanitary defects, the conditioning and handling operations performed by grain elevator operators simply dilute certain defects present in some smaller grain masses throughout a larger grain mass.

Baldwin concluded that firms such as Garnac view themselves primarily as merchandisers of grain rather than producers or manufacturers of a product. For the purposes

of his expert report, Baldwin defined a "grain merchant" as a "wholesaling middleman" who buys grain from and sells grain to farmers, other merchants, and processors. Baldwin also defined a "grain processor" as someone who transforms raw grain into different forms of intermediate products such as corn meal, oil, and sweeteners.

Baldwin agreed that many of Garnac's activities, such as drying, cleaning, and blending, were "productive" in the sense that these operations added value to the grain from an economic perspective. Baldwin, however, refused to equate the concept of "adding value" from an economic perspective with the term "production" as that term is generally used in the grain industry.

Moore was a retired grain company executive with over 60 years of experience in the grain industry. Based on his experience, Moore testified that grain elevator operations were not generally considered to constitute production in the grain industry. Rather, Moore concluded that the grain industry regarded grain elevator operations as a stage in the marketing process of gathering grain from thousands of producers and delivering it to a relatively few grain processors. Moore stated that production in the grain industry included grain production by farmers as well as the output of grain products by wheat, corn, and soybean processors.

In summary, all of the expert witnesses agreed that grain can be dried, cleaned, fumigated, aerated, or blended in order to deliver the quality and grading characteristics required by Government regulations and customer specifications. Similarly, all of the experts agreed that grain elevator operations required skill and judgment. The disagreement among the experts turns upon what to call these operations—production or assembly. To some extent each expert witness simply offered opinions as to the character of Garnac's operations that were expressions of their beliefs as to how this case should be decided. See *Marx & Co. v. Diners Club,* 550 F.2d 505, 510 (2d Cir. 1977). For example, Shuey concluded that the pre-export processing of grain at country and export elevators, such as those operated by Garnac, "should properly be considered to be production." Although Shuey asserted that there was "no good reason

why Garnac's operation should not be considered production," neither he nor any other witness categorically concluded that the operations at issue *are* generally considered production in the grain industry. We give the greatest weight, therefore, to the testimony of Moore, the retired grain executive, and the absence of any industry evidence refuting his conclusion that farmers and some processors, but not grain handlers such as Garnac, are considered in the industry to be engaged in production.

### B. *Legal Criteria*

This Court recently considered the application of section 1.993-3(c)(2)(iii), Income Tax Regs., to a taxpayer's timber harvesting operation in *Webb Export Corp. v. Commissioner*, 91 T.C. 131 (1988). The taxpayer in *Webb Export Corp.*, an exporter of veneer, lumber, and veneer-quality logs, bought standing timber and hired a logging crew to fell the trees, clean the branches off the trees, and cut the trees into veneer logs. In determining whether the taxpayer's logging operations were generally considered to constitute production, the Court reviewed evidence of the complexity of the operational steps, the judgment required of the operator, the requirements and specifications of customers, and the manner in which industry literature and participants referred to the logging operations. 91 T.C. at 147-148.

After describing the six basic steps of the taxpayer's logging operations, we stated:

> These various steps, a time-consuming, yet time-constrained, process in which petitioner possessed all the necessary tools and equipment utilized in its logging operations, when combined, constitute a process substantial in nature. * * * [There is] nothing insignificant or insubstantial in petitioner's "utilization of proper equipment, by trained personnel, in a time-consuming process which has, as its result," a high quality, individually identifiable veneer-quality log satisfying the specifications of its purchaser. [*Webb Export Corp. v. Commissioner*, 91 T.C. at 144 (quoting *Dave Fischbein Manufacturing Co. v. Commissioner*, 59 T.C. 338, 360 (1972)).]

Respondent argues that "grain passes through Garnac's elevators essentially unchanged enroute to a final user." Respondent also contends that "the small relative contribu-

tion of Garnac's costs to grain value" demonstrates that Garnac's activities are not "substantial in nature." These arguments, however, ignore much of the evidence. They confuse the third test under the regulations, section 1.993-3(c)(2)(iii), Income Tax Regs., quoted above, with the substantial transformation test of subsection (ii) and the percentage of cost test in subsection (iv), described above.

Like the steps performed by the taxpayers in *Webb Export Corp.*, Garnac's operations required trained and experienced personnel employing both skill and judgment in the performance of their duties. The operations performed at Garnac's grain elevators were substantial in nature with respect to the grain passing through them. To be considered "production," however, Garnac's operations must also be generally considered to constitute production.

In applying the DISC regulations to Webb Export Corp.'s logging operations, we did not further define the term "production." Rather, in reaching the conclusion that "the weight of the evidence" established that the taxpayer was engaged in production, we relied on several factors:

(1) Loggers consider themselves to be producers; (2) standing timber is not particularly useful to manufacturers; (3) substantial activities are required before such materials are useful to manufacturers; and (4) the items considered to be raw materials and who is perceived to be a producer, varies depending upon one's position in the manufacturing and/or production process. [91 T.C. at 148.]

Petitioners concede that "because of the nature of the agricultural industry the operations performed by Garnac are sometimes referred to by the special industry nomenclature 'grain handling.' " Petitioners argue, however, that the DISC benefits should not "be conferred or withheld based on the fortuity of a particular industry's nomenclature." Rather, petitioners contend that the words "generally considered" imply an objective test, is the borrower engaged in production, not a subjective test, is the borrower referred to as a producer. We cannot reconcile petitioners' position with the language of the regulations and our analysis in *Webb Export Corp.* Use of the term "generally considered" necessitates determination of the subjective view of others as to what is—not our view of what should be.

Petitioners ask that we ignore the grain industry nomenclature and look instead to the same types of evidence we considered in *Webb Export Corp. v. Commissioner, supra.* Specifically, petitioners argue that the complexity of Garnac's operational steps, the judgment required of grain elevator operators, and the requirements and specifications of customers for grain with offgrade or nongrade characteristics are strong indications that Garnac was engaged in production. Petitioners contend that the same four factors that led this Court to conclude that "the weight of the evidence" established that Webb Export Corp. was engaged in production are present in the instant case. Petitioners maintain that (1) grain elevator operators do consider themselves to be producers; (2) grain standing in the field is not particularly useful to manufacturers; (3) substantial activities are required before grain is useful to manufacturers; and (4) whether grain is considered to be a raw material and who is perceived to be a producer can vary depending upon one's position in the grain industry.

Petitioners' arguments are not supported by the evidence in this case, however. (1) The only indications that grain elevator operators consider themselves to be producers are their claim in this case and similar claims made in other litigation. (2) Garnac does not cut the grain standing in the field but receives it from others, who probably are producers, frequently in a condition in which it may be sold to Garnac's customers. (3) We have agreed that their activities are substantial. (4) As indicated above, so far as the record shows, petitioners' perception is based on their litigating position. The relevant test is how their activities are *generally* perceived in the industry and not perception from a particular viewpoint. *Webb Export Corp. v. Commissioner,* 91 T.C. at 148. Moreover, petitioners' proposed analysis would merge the "substantial in nature" and "generally considered production" requirements of the statute and regulations.

Respondent argues that, in contrast to Webb Export Corp.'s logging operations, Garnac purchased already harvested grain as a fungible commodity in lots that conformed to Federal grade standards. Similarly, respondent argues that the end result of Webb Export Corp.'s opera-

tions was individually identifiable logs, while the grain leaving Garnac's elevators was a commingled mass assembled from lots delivered by farmers or other grain merchants and essentially unchanged enroute to a final user. These factual distinctions are consistent with respondent's characterization of Garnac's activities as assembly and packaging.

Garnac argues that, whenever courts have been called upon to consider the nature of grain elevator operations, they have consistently concluded that the drying, blending, aerating, fumigating, and cleaning operations constitute production. Thus, in *Schuyler Grain Co. v. Commissioner,* 50 T.C. 265 (1968), affd. 411 F.2d 649 (7th Cir. 1969), this Court was called upon to decide whether the taxpayer's five newly constructed grain storage bins were used "in connection with" a manufacturing or production activity for purposes of the investment tax credit (ITC). The taxpayer in *Schuyler,* like petitioners herein, aerated, dried, blended, and stored corn, wheat, and soybeans. The Tax Court concluded that the taxpayer's business, "when considered as an integrated operation, consisted of numerous activities which we think were intended to be included within the words 'manufacturing' and 'production,' as these words were used in section 48." 50 T.C. at 272.

Although section 48 did not define the term "production," section 1.48-1(d)(2), Income Tax Regs., provided that "the terms 'manufacturing,' 'production,' and 'extraction' include the construction, reconstruction, or making of property * * * from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles." In view of this broad definition of manufacturing, production, and extraction, we concluded that the taxpayer's storage and handling of grain was production for purposes of section 48. 50 T.C. at 272. Other cases applying the ITC regulations have similarly applied a broad interpretation of the terms "production" and "processing." See, e.g., *Giannini Packing Corp. v. Commissioner,* 83 T.C. 526 (1984); *Northville Dock Corp. v. Commissioner,* 52 T.C. 68 (1969), affd. 427 F.2d 164 (2d Cir. 1970).

Respondent argues that *Schuyler Grain Co. v. Commissioner, supra,* and other cases interpreting and applying the ITC regulations are not controlling in this case. We agree. The term "production" has no generalized meaning in the Internal Revenue Code. *Spalding v. Commissioner,* 66 T.C. 1017, 1021 (1976).

The differences between section 1.48-1(d)(2), Income Tax Regs., which defines the term "production" for ITC purposes, and section 1.993-3(c)(2), Income Tax Regs., which defines the same terms for purposes of the DISC statute, are significant. The ITC regulation specifically includes "combining" and "assembling" in the definition of "manufacturing" and "production." In contrast, the DISC regulation at issue herein specifically excludes "assembly" or "packaging" in the definition of "manufactured" and "produced." Further, the ITC regulation, unlike the DISC regulation, does not require that the activity be generally considered production or that it be substantial in nature.

The DISC provisions, sections 991 through 997, were enacted by Congress to provide tax incentives for U.S. firms. Secs. 501-507, Revenue Act of 1971, Pub. L. 92-178, 85 Stat. 497, 535-553. Specifically, the DISC provisions were designed to stimulate exports and to remove tax disadvantages for U.S. firms engaged in exporting through domestic corporations rather than through foreign subsidiaries. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 502, 529; S. Rept. 92-437 (1971), 1972-1 C.B. 559, 565, 609; *Dresser Industries, Inc. v. Commissioner,* 92 T.C. 1276, 1280 (1989); *Foley Machinery Co. v. Commissioner,* 91 T.C. 434, 438 (1988).

Both the Senate and the House Committee reports spell out the definitions of export property and producer's loans that were later incorporated in the regulations. H. Rept. 92-533, 1972-1 C.B. 498, 534-535; S. Rept. 92-437, 1972-1 C.B. 559, 615-616. The legislative history, however, does not provide a definition for the critical term "production."

Petitioners argue that the modifier "generally considered," as it is used in the regulation, "envisions the broadest possible construction of the statute's terms" and is "consistent with the legislative purposes of the DISC statute." The legislative history of the DISC statute, however, merely discusses Congress' general desire to encourage

exports. Broad interpretations are not sufficient to qualify Export as a DISC in light of the detailed statutory framework that has been enacted.

Petitioners also cite numerous State court decisions holding that operations similar to Garnac's constituted production or manufacturing. Similarly, petitioners cite various State statutes that define production or manufacturing for ad valorem, sales, and property tax purposes. The DISC provisions, however, are a matter of Federal income tax law, and cases interpreting State law are not dispositive or helpful. *United States v. Mitchell*, 403 U.S. 190, 197 (1971). Moreover, special legal applications of a term cannot reasonably be construed as equivalent to "generally considered" use of the term within an industry.

Petitioners presented evidence of expert witnesses and company officials and have argued that decisions by this and other courts and the legislative history of the DISC statute demonstrate that Garnac's grain elevator operations constitute production. They have not persuaded us that Garnac's activities with respect to grain storage and handling during the years in issue are generally considered in the industry to constitute production or that these activities were not fairly characterized as assembly and packaging for purposes of section 1.993-3(c)(2)(i), Income Tax Regs. We cannot conclude that legal classification of activities as production in other contexts qualifies them as "generally considered to be production" within the meaning of the DISC regulations and *Webb Export Corp.* Accordingly, petitioners have not carried their burden of demonstrating that Garnac was engaged in production during the years in issue.

### Growing Export Property

As quoted above, section 993(d)(1)(C) provides that a producer's loan may be made to a person engaged in the growing of export property. Garnac contends that the loans from Export are producer's loans because, in the year the loans were made, it was engaged in the business of farming on arable land that it owned in Springfield, Illinois, and Davenport, Iowa.

In March 1974 when the loans in issue were made, Garnac did not own either parcel of land on which it subsequently grew grain. Moreover, no crops were grown at either location during the years ended January 31, 1974 and 1975.

In addition, section 1.993-3(d), Income Tax Regs., requires that the taxpayer establish that the crops were held for sale outside the United States. The parties have stipulated that the crops grown on Garnac's lands were sold to domestic third parties and that Garnac has no documents concerning the use or further disposition of the grain by these third parties. Garnac has not met the substantiation tests set forth in the regulations; accordingly, the crops cannot be considered export property. Because we have concluded that the crops were not export property, we need not decide whether the actual amounts of soybeans or grains grown were sufficient to qualify Garnac as being engaged in growing expert property.

## Investment in Export-Related Assets

Respondent also argues that Export's loans to Garnac do not qualify as producer's loans because, during the year in which the loans were made, Garnac did not increase its investment in export-related assets by an amount equal to the amount of the loans. See section 993(d). The only category of qualifying assets material to this dispute is "property held primarily for sale * * * in the ordinary course of [the borrower's] trade or business." Sec. 993(d)(2)(B).

Garnac's balance sheets reflected an item entitled "Market adjustments on open trades," which represents the yearend value of contracts for future purchases and sales of grain computed by comparing the contract prices with the yearend market prices. Petitioners presented evidence that such adjustments are commonly made in the industry. They contend that the amounts of these adjustments constitute "inventory" even though they are separately stated and not included as inventory on Garnac's financial statements and tax returns.

Respondent argues that the market adjustments do not reflect an investment of the loan proceeds by Garnac in

property held for sale during the year in which the loan was made. Respondent acknowledges that the Internal Revenue Service has recognized and approved the industry practice of valuing commodities actually on hand at market value at the end of the year. See Rev. Rul. 74-226, 1974-1 C.B. 119. Respondent contends, however, that open contracts do not represent commodities that are available for sale and therefore may not be included in inventory. Respondent also argues that the market adjustments should be disregarded because they are inconsistent with the statutory definition of inventory.

Section 471 provides the general rule that:

inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Section 1.471-1, Income Tax Regs., provides that:

Merchandise should be included in the inventory only if title thereto is vested in the taxpayer. Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers), title to which has passed to the purchaser. A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not been effected.

Garnac argues that for purposes of section 993, " 'property' and 'inventory' appear to be interchangeable" and that Congress did not intend to exclude from inventory open contracts like those involved here. Garnac points out that, in determining whether an asset can be characterized as a capital asset, the Supreme Court has held that the inventory exclusion of section 1221 is not to be restrictively read. *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 215 (1988).

Section 1221 defines "capital asset" broadly, as "property held by the taxpayer (whether or not connected with his trade or business)," and then excludes five specific classes of property, including "property of a kind which would

properly be included in the inventory of the taxpayer." Garnac argues that this exclusion is not limited to actual inventory but also extends to contracts for the purchase of inventory, where those contracts are used "as an integral part of a business' inventory-purchase system."

Garnac's argument concerning section 1221 is unpersuasive. Once commodities subject to open trades are actually acquired or sold by Garnac, the resulting gains or losses will be treated as ordinary income. Concluding that the items are not capital assets, however, does not lead to characterization of them as inventory currently *held* for sale to customers. At the relevant time, open trades or contracts were integral to Garnac's business, but those contracts were not held for sale to customers.

The mark-to-market inventory valuation method is useful in accurately stating Garnac's yearend financial position. The mark-to-market valuation of Garnac's open trades, however, does not measure the amount of property held for sale to customers. Accordingly, "Market adjustments on open trades" should be disregarded in computing Garnac's export-related assets.

To reflect the foregoing and concessions by the parties,

*Decisions will be entered under Rule 155.*